### UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-341 (RBW)** |
| **v.** | : | |
| | : | |
| **ANNA LICHNOWSKI,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth below, the government requests that the Court sentence the defendant, Anna Lichnowski, to twelve months of incarceration, one year of supervised release, and $500 in restitution.

### I.    INTRODUCTION

The defendant, Anna Lichnowski, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Lichnowski was convicted at trial of violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). The government's recommendation is supported by the following factors: (1) Lichnowski unlawfully entered the Senate Wing Doors despite the blaring alarm, broken windows, and police officers in riot gear on the Upper West Terrace; (2) she was a participant in the disruptive mob inside the Senate Wing Doors and Crypt, chanting "Traitor" and "It's Our House" at various points; (3) she remained inside the Capitol building for nearly forty minutes, sitting on a portable chair and making herself at home in the Crypt; (4) while inside, Lichnowski ignored a U.S. Capitol Police officer who ordered her to leave; (5) after exiting the building, Lichnowski remained within the restricted area on the East Plaza of the Capitol for another 45 minutes; (6) Lichnowski knew about the election certification process and wanted to "be there for the votes" on January 6; (7) the Court found that Lichnowski was "not truthful" and "sought to deceive the Court" while testifying; and (8) Lichnowski lacks remorse and acceptance, as evidenced by her misleading testimony.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a larger, violent riot that relied on sheer numbers to overwhelm police, breach the U.S. Capitol, and disrupt congressional proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Lichnowski's crimes support a sentence of twelve months' incarceration.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  The January 6, 2021 Attack on the Capitol

The government refers the Court to the statement of facts in this matter for a general summary of the attack on the U.S. Capitol on January 6, 2021. *See* ECF No. 1-1.

### B. Lichnowski's Role in the January 6, 2021 Attack on the Capitol

The evidence presented at trial showed that on January 6, 2021, Lichnowski participated in the riot at the U.S. Capitol. Lichnowski unlawfully entered the Senate Wing Doors where she joined a disruptive mob chanting "Traitor" and "It's Our House." *See* July 10, 2024 Trial Tr. 48:23-24; Government Exhibit 119A.1 (from 0:00 to 0:07 elapsed). From the Senate Wing Doors, Lichnowski proceeded to the Crypt where she remained unlawfully for 30 minutes despite interacting with multiple police officers.[2] Lichnowski eventually exited the Capitol through the Memorial Doors at 3:32 p.m., having been inside the building for nearly forty minutes.

Specifically, Lichnowski believed the 2020 presidential election was fraudulent. In November and December 2020, Lichnowski posted on Facebook about voter fraud in the election and expressed interest in the Electoral College certification process in the states.

**Author** Anna Lichnowski (Facebook: 24703855)
**Sent** 2020-11-09 21:08:52 UTC
**Body** The Dems have showed their part in this voter fraud game. Once the lids blown off it'll be nuts

**User** Anna Lichnowski (24703855)
**Text** @[199800509:2048:Chris t'Simon] again, some states dont even have to certify until 12/8. No one's won anything lol
**Time** 2020-11-10 12:12:41 UTC

**Time** 2020-12-11 06:40:56 UTC
**Type** Search
**Summary** Anna Lichnowski searched for "Voter fraud is real!".
**Object Id** S:_I24703855:10101946686920848:1

*Government Exhibits 202A, 203A, 204A*

---

[2] Attempting to relitigate facts adduced at trial, the defendant claims that Lichnowski did not interact with multiple officers. *See* ECF No. 64 at 27. But the video evidence speaks for itself. Two U.S. Capitol Police officers approached and interacted with Lichnowski when she entered the Crypt. *See* Government Exhibit 105A.1 (at 3:01:46PM). The video evidence also showed U.S. Capitol Police Officer Tyrone Adonis approaching the defendant in the Crypt and instructing her to leave. *See* Government Exhibit 106A.1 (at 3:22:19PM).

Lichnowski's intent to disrupt Congress materialized by late December 2020. On December 31, she again posted on Facebook—this time about going to Washington, D.C. on January 5 and 6 to "*be there for the votes.*" Twelve minutes later, she expressed her "hope" that President Trump would invoke the Insurrection Act to overturn the election results. At trial, Lichnowski testified that she knew that Congress would be meeting to certify the election on January 6, 2021, and that she was interested in observing the process because she had cultivated an interest in election integrity. *See* July 9, 2024 Trial Tr. 162:25–163:23.[3]

> **Author** Anna Lichnowski (Facebook: 24703855)
> **Sent** 2020-12-31 17:00:36 UTC
> **Body** I'll be in DC the 5th and 6th hahaha I wanna be there for the votes
>
> **Author** Anna Lichnowski (Facebook: 24703855)
> **Sent** 2020-12-31 17:00:48 UTC
> **Body** I hope he just uses the insurrection act

*Government Exhibit 205A*

After traveling from New Jersey to the District of Columbia on January 5, Lichnowski attended the "Stop the Steal" rally at the Ellipse on the morning of January 6. There, she listened to President Trump's speech. Lichnowski admitted on cross-examination that she saw individuals at the rally go through security and metal detectors, but not when she entered the Capitol later that

---

[3] The defendant first argues that the PSR improperly references Lichnowski's social media posts about the validity of the 2020 presidential election. *See* ECF No. 64 at 27. According to the defendant, the posts are not relevant at sentencing and violate the First Amendment. As this Court found, however, Lichnowski's social media posts are probative of her intent, motive, and knowledge. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."). The defendant next argues that Lichnowski's posts do not evince an "intent to disrupt Congress." ECF No. 64 at 27. But Lichnowski's stated intent to "be there for the votes," coupled with her actions on January 6, proved beyond a reasonable doubt an intent to disrupt government business, as this Court necessarily found in convicting Lichnowski on Counts Two and Three.

4

same day. July 10, 2024, Trial Tr. 23:24–24:2, 44:20–45:1. She also stated that she knew Vice President Mike Pence would be at the Capitol to preside over the certification. *Id.* at 25:20-21.[4]

After attending the rally, Lichnowski testified that she traveled to the Capitol, arrived at Peace Circle, and walked north. *Id.* at 159:13–160:4. From her vantage point, she could see that the West Lawn of the Capitol had been "overrun" by rioters, as she described it. *Id.* at 160:12. At 2:35 p.m., she purportedly received a phone call from a friend, Jaycee Cook, who had been watching the news and heard that the Capitol had been evacuated. *Id.* at 160:20–162:17. Based on this call, which never happened,[5] Lichnowski claimed that she thought Congress had been evacuated and, incredibly, she decided to "get closer" to the Capitol to see what was "transpiring." *Id.* at 162:12-13.

Shortly thereafter, Lichnowski entered the restricted area on the northeast side of the building at approximately 2:41 p.m. *See* Government Exhibit 101A.1 (at 2:41:45PM); Government Exhibit 126 (at 2:41:45PM). As she made her way around to the Upper West Terrace of the Capitol, Lichnowski encountered a line of police officers in riot gear—including helmets and gas masks—as they made their way across the terrace, as pictured below. Lichnowski acknowledged smelling

---

[4] Lichnowski concedes, as she must, that "she knew Vice President Mike Pence would be at the Capitol to preside over the certification." ECF No. 64 at 28. But she now claims that she did not know the Vice President was present in the Capitol when she entered "because she thought at the time that the Capitol had been evacuated." *Id.* As the D.C. Circuit recently held, convictions for violating sections 1752(a)(1) and (2) only require that Lichnowski knew that she entered or remained in a "posted, cordoned off, or otherwise restricted" area. *See United States v. Griffin*, 2024 WL 4536993, at *1 (D.C. Cir. 2024). Regardless of *Griffin*'s implications, the government proved that the defendant knew that the Vice President was or would be temporarily visiting the U.S. Capitol that day. Any claim otherwise rings hollow.

[5] Lichnowski introduced phone records to show that this purported call occurred. *See* Defense Ex. 4. On cross-examination, however, the government proved that the call records were reported in UTC time, not eastern standard time. *See* July 10, 2024 Trial Tr. 33:4–34:10. UTC stands for "Coordinated Universal Time," is reported in military time, and is 5 hours ahead of eastern standard time. Accordingly, the call never took place at 2:35 p.m. EST as Lichnowski claimed; it took place at 9:35 p.m. EST on January 5.

tear gas in her vicinity—which was corroborated by a Facebook post on January 16, 2024, in which Lichnowski said, "I was there. I SMELT the tear gas." Government Exhibit 211A.



*Government Exhibit 112*
*(Lichnowski, circled in yellow, on the Upper West Terrace positioned near Riot Police)*

At 2:53 p.m., Lichnowski unlawfully entered the Capitol through the Senate Wing Doors. *See* Government Exhibit 104A.1. By that time, a blaring alarm was sounding and broken glass from rioters breaking windows littered the ground. Lichnowski testified that she noticed the broken windows and could see individuals climbing through them as she entered the building, but incredibly claimed that she did not think that was a signal she should not enter the building. *See* July 9, 2024 Trial Tr. 166:4-9; July 10, 2024 Trial Tr. 42:7-14. Lichnowski also acknowledged in her testimony that she "sporadically" heard the alarm, but said she thought it was a fire alarm. *See* July 10, 2024 Trial Tr. 44:10-19.



*Government Exhibit 104A.1*
*(Lichnowski, circled in yellow, entering the Senate Wing Doors)*

Upon entering the Senate Wing Doors, the defendant joined the disruptive mob of people who were screaming and chanting very loudly. She raised a cellphone over her head several times and appeared to take photos or record videos of the mob. Lichnowski also admitted that she participated in the "Traitor" chant with the mob. *See* July 10, 2024 Trial Tr. 48:23-24. She remained in the area around the Senate Wing Doors for seven minutes. At one point, Lichnowski stood mere feet away from a line of U.S. Capitol Police officers in riot gear guarding the north end of the hallway, as shown below. She testified that she stayed within "direct view" of those officers. *Id.* at 10:22. U.S. Capitol Police Officer Jared Pias, who was one of those officers, testified that he could hear the sounding alarm through his helmet and that no one who entered through the Senate Wing Doors had passed through a security screening, and therefore were not authorized to be in the Capitol. *See* July 8, 2024 Trial Tr. 71:24–72:6, 75:1-10. In fact, Officer Pias explained that the Senate Wing Doors are an emergency fire door not accessible to members of the public. Id. at 66:4-7, 69:2-13.

According to Lichnowski, she believed several rioters were "cooperating" with U.S. Capitol Police. *See* July 9, 2024. Trial Tr. 166:11. Lichnowski claimed—incredulously— that one of the officers, who wore a garrison cap and appeared to be in charge, gave the rioters permission to proceed further into the building. *Id.* at 166:22–167:3. As she walked towards the Crypt, Lichnowski passed by vandalized furniture on the floor and saw other rioters standing on that furniture. *See* July 10, 2024 Trial Tr. 9:17–10:3, 46:8-15.



*Government Exhibit 104A.1*
*(Lichnowski, circled in yellow, near a police line, circled in red, inside of the Senate Wing Doors)*

From the Senate Wing Doors, the defendant walked further into the Capitol, entering the Crypt where she remained unlawfully for nearly 30 minutes. Upon entering the Crypt, two U.S. Capitol Police officers approached and interacted with Lichnowski. *See* Government Exhibit 105A.1 (at 3:01:46PM).[6] One of the officers pointed towards the other end of the Crypt as if to indicate that she should move to or leave in that direction. On direct examination, however,

---

[6] The defendant contests this fact, claiming that "the only evidence provided by the government was the sole testimony of one officer, Tyrone Adonis." ECF No. 64 at 29. But this ignores the uncontroverted video evidence admitted at trial. *See* Government Exhibit 105A.1 (at 3:01:46PM).

Lichnowski claimed that one of these officers merely told her not to touch anything. *See* July 9, 2024 Trial Tr. 11:25–12:6. Lichnowski ignored the officers and did not leave. Instead, she sat down on a portable stool (pictured below) and made herself at home in the Crypt while she chanted, "It's Our House!" *See* Government Exhibit 119A.1. Meanwhile, Congress could not resume its work until every unauthorized individual, including Lichnowski, was removed from the building, as the testimony at trial established. *See* July 9, 2024 Trial Tr. 62:4-6.



*Government Exhibit 119A.1*
*(Lichnowski, circled in yellow, sitting on a stool in the Crypt)*

At 3:22 p.m., a third U.S. Capitol Police officer, Officer Tyrone Adonis, approached the defendant and instructed her to leave, as shown below. Officer Adonis testified that he did not remember Lichnowski, but that he told countless individuals to leave the building that day. *See* July 9, 2024 Trial Tr. 49:8–50:14. After reviewing the video evidence, Officer Adonis testified that he has no reason to believe that his interaction with Lichnowski was any different. *Id.* at 55:19-25. On direct examination, Lichnowski claimed that she had no recollection of Officer Adonis telling her to leave and that she would have remembered if he told her to leave. *See* July 10, 2024 Trial Tr. 17:16-25. On cross examination, however, Lichnowski changed her story and admitted that Officer Adonis instructed her to leave. *Id.* at 52:24–54:2.



*Government Exhibit 106A.1*
*(Lichnowski, circled in yellow, after Officer Adonis, circled in red, instructed her to leave)*

Lichnowski did not comply with Officer Adonis's instruction and continued to remain unlawfully in the Crypt. In her testimony, Lichnowski claimed that during this time, she looked for an exit but was unable to leave. *See* July 10, 2024 Trial Tr. 18:5–19:2. In fact, video evidence shows that she picked up her things and moved to another pillar, which she leaned against for another ten minutes, making no effort to leave. *See* Government Exhibit 106A.2 (from 3:22:00 to 3:31:55PM). It was only when police officers flooded the Crypt that Lichnowski decided to leave. *See id.* (at 3:32:00PM). Lichnowski eventually exited the building through the Memorial Doors at approximately 3:32 p.m., having been inside the building for nearly 40 minutes.

Despite the alarm blaring as she entered the Capitol building, the police presence by the Senate Wing Doors, and interacting with police officers in the Crypt, Lichnowski did not leave the restricted area around the Capitol, even after exiting the building. Instead, the defendant remained within the restricted area on the East Plaza of the U.S. Capitol for another 45 minutes. *See* Government Exhibit 110A.1 (from 3:33:03 to 4:16:10PM).[7] At approximately 4:16 p.m., the defendant took a photograph of the east front of the Capitol and posted it to Facebook. *See* Government Exhibit 208A. Shortly thereafter, the defendant departed the restricted area, passing by emergency response vehicles and remnants of the barricades that constituted the restricted area. *See* Government Exhibit 111A.1 (from 4:17:19 to 4:19:59PM).

In the aftermath of January 6, Lichnowski commented about the riot at the Capitol on social media and minimized its impact. On January 10, 2021, the defendant responded to another

---

[7] The defendant claims that there was "insufficient evidence" to conclude that she remained in a restricted area on the East Plaza of the Capitol after she exited the building. *See* ECF No. 64 at 30. Lichnowski knew full well that the area was restricted by this point in time. She saw rioters climbing into the building through broken windows, heard a blaring alarm, walked by vandalized property, and was instructed to leave by a police officer. Despite all of this, Lichnowski made a choice to remain feet away from the building for another 45 minutes after exiting.

comment on Facebook acknowledging vandalism and trespassing at the Capitol. When another individual contrasted January 6 to other riots, Lichnowski responded: "please help me understand how vandalism and trespassing are more threatening than the assault, harassment, murder, looting, robbery, destruction, etc. BLM/ANTIFA participated in just a few short months ago." Government Exhibit 209A.[8]

### C. Factual Findings by the Court

According to the Court, the evidence at trial proved that Lichnowski did not agree with the results of the 2020 presidential election and wanted to influence the certification proceeding at the Capitol on January 6, 2021. The Court found insufficient evidence that Lichnowski passed barricades with "area closed" signage to put her on notice that the Capitol grounds were restricted. *See* July 10, 2024 Trial Tr. 116:11-24. By the time she arrived at the Senate Wing Doors, however, the evidence proved that Lichnowski saw rioters entering the building through broken windows and heard the alarm—which would have put a reasonable person on notice that the building was restricted. *Id.* at 117:10-19. The Court explained that Lichnowski's decision to enter the building despite hearing the "fire alarm," as she characterized it, defied common sense. *Id.* at 117:19-25.[9]

Citing *United States v. Alford*, 89 F.4th 943 (D.C. Cir. 2024), the Court ruled that, upon entering the Capitol, Lichnowski willfully and knowingly joined the mob by chanting "Traitor."

---

[8] Lichnowski claims that she only learned about vandalism and trespassing at the Capitol "from media reports, not firsthand observance or participation." ECF No. 64 at 31. This is directly contradicted by the video evidence showing Lichnowski passing by vandalized property near the Senate Wing Doors and the Court's finding that she knowingly trespassed in a restricted area.

[9] This Court held that the government need not prove that the defendant knew the Vice President would be visiting the Capitol to establish violations of 18 U.S.C. § 1752(a)(1) and 18 U.S.C. § 1752(a)(2). The Court nonetheless explained that, even if the government had that burden, the government submitted sufficient evidence to prove beyond a reasonable doubt that Lichnowski had knowledge of the Vice President's presence at the Capitol on January 6, 2021. *See* July 10, 2024 Tr. 119:6-19.

July 10, 2024 Trial Tr. at 118:1-15. She did not take any actions to disassociate herself from the mob. The Court found Lichnowski's conduct to be disorderly and disruptive, and that her conduct, along with the conduct of others, disrupted the certification proceeding. *Id.* at 118:16–120:3. Although Congress was in recess, the mob had overrun the Capitol and law enforcement had significant security concerns about unauthorized individuals in the Capitol. *Id.* at 118:22–119:12. Those individuals, including Lichnowski, created an environment in which Congress could not safely resume its work. *Id.* at 119:13-19.

The Court further explained that he did not find Lichnowski's testimony to be "convincing." *Id.* at 122:14. To the contrary, Lichnowski was not "truthful" and "sought to deceive the Court by the statements that she made, which were not sufficient in accomplishing that objective." *Id.* at 122:14-17.

The Court was likely referring to several falsehoods including, among other things: (1) Lichnowski's false claim about taking a phone call (which never happened) at 2:35 p.m. EST in which she purportedly learned that the Capitol had been evacuated; (2) Lichnowski's claim that her seeing people climbing in broken windows and hearing an alarm did not make her think she was not allowed to be in the building; (3) Lichnowski's uncorroborated claim that a senior U.S. Capitol Police officer gave her and others permission to go further into the building; (4) Lichnowski's claim that she originally did not remember Officer Adonis instructing her to leave and changing her story on cross-examination; and (5) Lichnowski's claim that she attempted to find an exit after Officer Adonis instructed her to leave even though the video evidence shows her picking up her things and moving to another pillar, which she leaned against for another ten minutes.

13

### D.  Lichnowski's Objections to the Presentence Report

Ignoring the Court's findings and evidence admitted at trial, Lichnowski filed objections to the Presentence Report containing affidavits from the defendant and Jaycee Cook. These affidavits purport to show that Lichnowski did, in fact, communicate with her friend, Jaycee Cook, by text around 2:00 p.m. EST on January 6, 2021—prior to her entry into the Capitol. At trial, Lichnowski falsely claimed that she received a call from Cook at 2:35 p.m. EST in which she learned that the Capitol had been evacuated. In reality, however, the phone call took place at 2:35 UTC meaning that the phone call occurred five hours earlier at 9:35 p.m. EST on January 5. While the Court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy," U.S.S.G. § 6A1.3(a), it should reject the defendant's belated attempt to relitigate the Court's factual finding that she testified untruthfully.[10] The bottom line is that Lichnowski's testimony about receiving a phone call on January 6 telling her that the Capitol had been evacuated is false because that call *never* happened.

Lichnowski now claims that she had a good-faith basis to believe Congress had been evacuated, and therefore this Court's original finding that she testified untruthfully was misplaced. This is incorrect. The attachments to Cook's affidavit do not suggest that the Capitol had been evacuated and do not substantiate Lichnowski's tenuous belief that Congress was not there. For starters, the attachments are merely screenshots of images saved on Cook's phone; there is no

---

[10] The affidavits confirm that Lichnowski testified untruthfully about having a phone call with Jaycee Cook at 2:35 p.m. on January 6. In her affidavit, Lichnowski admits that she never communicated with Cook by phone. Lichnowski Aff. ¶ 23. She also admits that the only incoming phone call she received around the time in question was at 2:12 p.m. EST from her father's girlfriend at the time. *Id.* ¶¶ 23, 24. The call records further confirm that this call did not successfully connect. *Id.*, App. D at 2.

proof whatsoever that the screenshots were ever texted or communicated to Lichnowski. The first screenshot references the evacuation of the James Madison Memorial Building, which is part of the Library of Congress and is not the Capitol building itself. *See* Cook Aff., App. A. At trial, Lichnowski claimed that the phone call "led [her] to believe that *the building* was evacuated" and that "something happened *at the Capitol*"—a clear reference to the Capitol building itself. July 9, 2024 Trial Tr. 160:15-16, 162:11-12 (emphasis added). The second screenshot is from a news story discussing how staffers from the Madison and Cannon buildings had been evacuated. *See* Cook Aff., App. A. But the article makes no mention of the Capitol building itself or the members of Congress inside. In fact, the screenshot was taken at 1:55 p.m. and members of Congress and the Vice President did not evacuate until 2:20 p.m. *See* PSR ¶ 14. The third screenshot appears to be from an NBC News television report with the chyron, "PROTESTORS MOVE UP STAIRS OF CAPITOL *AS CONGRESS DEBATES ELECTORAL COLLEGE OBJECTIONS*." Cook Aff., App. A (emphasis added). This screenshot proves that protestors were moving up the stairs outside the Capitol while Congress was *still in session* debating objections to the Electoral College certification—directly contradicting Lichnowski's claim that she believed Congress had been evacuated and was no longer in session. Thus, Lichnowski's false testimony was the not the product of "confusion, mistake, or faulty memory." U.S.S.G. § 3C1.1 cmt. 3. And the affidavits do not repudiate the Court's factual finding that Lichnowski testified untruthfully; if anything, the evidence confirms her fabrication. By doubling down on this spurious narrative, Lichnowski still has not come to terms with her conduct on January 6 and lacks remorse for her actions.

Finally, while Lichnowski spends significant time attempting to undo the falsehood related to this errant phone call, she exercises little effort to address the other falsehoods that were material to this Court's factual findings, as discussed above.

### III.    THE COUNTS OF CONVICTION

On September 28, 2023, the United States charged Lichnowski by a four-count Information with violating 18 U.S.C. § 1752(a)(1) (entering or remaining in a restricted building or grounds), 18 U.S.C. § 1752(a)(2) (disorderly or disruptive conduct in a restricted building or grounds), 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds of or in any U.S. Capitol building), and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in the U.S. Capitol building). ECF No. 18. On July 10, 2024, after a three-day bench trial, Lichnowski was convicted of all four counts. ECF No. 58.

### IV.    STATUTORY PENALTIES

As noted by the Presentence Report issued by the U.S. Probation Office, Lichnowski faces up to one year of imprisonment, one year of supervised release, a $100,000 fine, and a $25 special assessment for both Counts One and Two. She faces up to six months of imprisonment, five years of probation, a $5,000 fine, and a special assessment of $10 for both Counts Three and Four.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with Probation's calculation of the combined adjusted offense level of 12, including the two-level adjustment for obstruction of justice under § 3C1.1. *See* PSR ¶¶ 47-

52. As discussed above, this Court found that Lichnowski intended to deceive the Court while testifying.

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.4) | 10 |
| Adjustment for Obstruction of Justice (U.S.S.G. § 3C1.1) | +2 |
| **Total Adjusted Offense Level** | **12** |

The defendant disputes the base offense level for Count Two—disorderly or disruptive conduct under 18 U.S.C. § 1752(a)(2). The Guidelines list two potentially applicable guidelines for section 1752 offenses: U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2A2.4, which applies to impeding officers, is the most appropriate guideline for 18 U.S.C. § 1752(a)(2), which prohibits "disorderly or disruptive conduct." That is because section 1752(a)(2) does not prohibit unauthorized entry, but rather conduct that impedes or disturbs the orderly conduct of government business or official functions. *See United States v. Nassif*, 97 F. 4th 968, 983 (D.C. Cir. 2024) (upholding application of U.S.S.G. § 2A2.4 because obstruction of officers is implicit in section 1752(a)(2) violation); *id.* ("Indeed, it is hard to see how someone could impede the orderly conduct of government business in a building temporarily restricted for a visit by a Secret Service protectee . . . without at least obstructing or impeding the work of the officers who restrict the space and guard the protectee."). This argument is thus foreclosed.

While the government concedes that § 4C1.1 applies to Lichnowski, the Court should vary upward by two levels to account for the reduction under § 4C1.1.[11] An upward variance is

---

[11] If Section 4C1.1 applies, and the Court does not vary upward, Lichnowski's total offense level would be 10 and her Guidelines range would be 6 to 12 months. *See* PSR ¶ 56. If the Court varies upwards by two levels, Lichnowski's total offense would be 12 and her Guidelines range would be 10 to 16 months.

necessary because the January 6 riot was a violent riot that threatened the lives of members of Congress and their staff, interrupted the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence, contributed to this harm. *See, e.g.*, *United States v. Alford*, 89 F. 4th 943, 953 (D.C. Cir. 2024) ("[Defendant's] entry into the Capitol—alongside dozens of others—directly contributed to the Congress's need to recess to ensure the safety of its members. Indeed, entering the Capitol as part of a crowd rather than as a lone individual magnified the disruptiveness of his presence. Each additional person, no matter how modestly behaved, increased the chaos within the building, the police's difficulty in restoring order and the likelihood of interference with the Congress's work"). Thus, the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the § 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is

accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. *See* PSR ¶ 59. Accordingly, the U.S. Probation Office calculated Lichnowski's total adjusted offense level at 10 after applying the two-point reduction for 4C1.1, and her corresponding Guidelines imprisonment range at 6-12 months. PSR ¶ 101.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that are subject to Guidelines. To reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. As described below, the Section 3553(a) factors weigh in favor of a sentence of twelve months' incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Lichnowski's

participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

Lichnowski willfully participated in the mob that disrupted the congressional proceedings on January 6, 2021. *See United States v. Mazzocco*, 21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers."). Lichnowski, knowing full well that Congress would be meeting to certify the votes, elected to walk from the former President's rally to the Capitol on January 6. In doing so, Lichnowski ignored numerous warning signs that the area was restricted— including the blaring alarm, her own admission that she smelled tear gas, rioters climbing through broken windows, and the heightened police presence. She nonetheless elected to enter the Senate Wing Doors where she joined the disruptive mob, chanting "Traitor" and later "It's Our House!" in the Crypt. Lichnowski remained unlawfully inside the building for nearly forty minutes, making herself at home when she posted up on a portable chair in the middle of the Crypt. During her time inside the building, Lichnowski failed to comply with the order of a U.S. Capitol Police Officer, who instructed her to leave. By refusing to leave, Lichnowski incrementally increased the chaos in the building, making it more difficult for the police to restore order and directly contributing to the disruption of Congress' work. *See Alford*, 89 F.4th 943 at 953. Instead of complying, Lichnowski moved and posted up on another pillar in the Crypt for the next ten minutes. Indeed, Lichnowski would have likely stayed even longer than she did; she only left when police officers flooded the Crypt around 3:32 p.m. The nature and the circumstances of Lichnowski's offense conduct establish the need for a sentence of incarceration and supervision.

### B. Lichnowski's History and Characteristics

Lichnowski does not have a criminal history, has a degree from Monmouth University, and has maintained employment throughout her life. *See* PSR ¶¶ 64-88. But by the same token, nothing in Lichnowski's background mitigates her culpability for her crimes as part of the mob that breached the Capitol on January 6, 2021. To the contrary, she was 33 years old at the time of the offense. She should have known better than to participate in a riot—particularly when she knew full well that Congress and the Vice President would be there administering their constitutional obligations.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233 (ABJ), Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. *See* 18 U.S.C. § 3553(a)(2)(B), (C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

1. <u>General Deterrence</u>

The need for general deterrence weighs heavily in favor of incarceration in nearly every

21

case arising out of the violent riot at the U.S. Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." *United States v. Thomas Gallagher*, 21-CR-41 (CJN), Tr. 10/13/2021 at 37. General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power from one president to the next. There is possibly no greater factor that this Court must consider in imposing a just sentence.

### 2.  Specific Deterrence

The need for the sentence to provide specific deterrence also weighs in favor of incarceration. After listening to the former president's speech, Lichnowski elected to join the mob at the Senate Wing Doors, in the Crypt, and outside the Capitol—knowing full well Congress' role in certifying the election results that day. The warning signs and police orders that Lichnowski disregarded were not enough to deter her from engaging in disorderly and disruptive conduct—as the certification of a democratic election hung in the balance.

Moreover, Lichnowski lacks remorse and has not accepted responsibility for her actions. In the aftermath of January 6, Lichnowski downplayed the January 6 riot when compared against other riots. *See supra* at 12; Government Exhibit 209A.  And her testimony on the stand, which she has doubled down on, undermines any claim of contrition. The Court's sentence must deter Lichnowski specifically, and others generally, from going down the path of political rioting again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in the riot at the U.S. Capitol, ranging from unlawful entry misdemeanors, such this case, to assault

on police officers, to conspiracy to corruptly obstruct Congress.[12] This Court must sentence Lichnowski based on her own conduct and relevant characteristics, but should give substantial weight to the context of other "defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Russell Dean Alford*, No. 21-cr-263 (TSC), the defendant was convicted of the same offenses as Lichnowski following a jury trial. Like Lichnowski, Alford (1) walked past repeated and obvious signs that the Capitol building and grounds were restricted until he could find an unobstructed entrance into the Capitol building; (2) refused to leave the Capitol—and, indeed, sought to go deeper inside—after police ordered him and other rioters to leave; (3) celebrated his participation on social media; and (4) demonstrated a lack of candor during his trial testimony in a way that minimized his role. Judge Chutkan sentenced Alford to 12 months of incarceration and 12 months of supervised release.

Similarly, in *United States v. John Maron Nassif*, No. 21-cr-421 (JDB), Judge Bates sentenced the defendant to seven months of incarceration and one year of supervised released after he was convicted of the same offenses as Lichnowski at a bench trial. Similar to Lichnowski,

---

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Nassif, among other things, (1) participated in and led chants, including "Who's House? Our house!" outside the Rotunda Doors; (2) remained unlawfully in the Rotunda after police officers ordered him to leave; (3) spread disinformation about the riot via social media; and (4) testified falsely at trial about being involuntarily pushed into the Capitol and his chanting. In *Alford* and *Nassif*, the Court imposed stiffer-than-normal sentences on misdemeanor charges based on the defendants' failure to comply with police orders and their false testimony on the witness stand. This Court should do the same here. The government's sentencing recommendation is the same as in *Alford* because Lichnowski's obstruction is most analogous to Alford's obstruction on the stand. Both fabricated narratives about why they did not know the area was restricted, both minimized their role in the riot, and both testified falsely about their interactions with police officers and attempting to leave. None of it was true, and all of it was calculated.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose

restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Lichnowski was convicted of violations of Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See*

*Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[13]

Because Lichnowski engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and her criminal conduct was a "proximate cause" of the victims' losses, if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for her individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make

---

[13] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

a "reasoned judgment.").

More specifically, the Court should require Lichnowski to pay $500 in restitution for her convictions on Counts I and II. This amount fairly reflects Lichnowski's role in the offense and the damages resulting from her conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges in this district where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.    FINE

Lichnowski's convictions subject her to a maximum fine of $100,000 on both Counts One and Two, and a maximum fine of $5,000 on Counts Three and Four. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine in addition to restitution. *See* PSR ¶¶ 89-98.

## IX.    CONCLUSION

Balancing the § 3553(a) factors, the government recommends that this Court sentence Lichnowski to twelve months of incarceration, one year of supervised release, and $500 in restitution. Such a sentence promotes respect for the rule of law, deters future political rioting, and punishes Lichnowski for her serious offense conduct and obstruction of justice.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Jake E. Struebing*
       JAKE E. STRUEBING
       Assistant U.S. Attorney
       D.C. Bar No. 1673297
       U.S. Attorney's Office for the
       District of Columbia
       601 D Street, N.W.
       Washington, D.C. 20530
       Phone: (202) 252-6931
       Email: Jake.Struebing@usdoj.gov