UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 1:23-CR-00341-RBW |
| : | |
| ANNA LICHNOWSKI, : | |
| : | |
| Defendant. : | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Anna Lichnowski, Defendant, by and through her Counsel, Terrell N. Roberts, III, submits this memorandum to aid in sentencing.

**Recommendation of Sentence of Probation**

The Court is respectfully requested to impose a sentence of probation. This is the appropriate sentence given that the Defendant is a Zero-Point Offender with a Criminal History Category of I; is a very low risk of another crime; is in Zone A (arguably Zone B) of the Sentencing Table; and that Defendant's actions inside the Capitol building did not involve vandalism, violence, or obstruction of the police. Moreover, the Defendant has fully complied with all terms of her pretrial release and is a good candidate for probation.

**I.    Nature and Circumstances of the Offense**

The Defendant drove from New Jersey to Washington, D.C. on 05 January 2021 to attend the Stop the Steal Rally in support of President Trump. Ex. 2, Transcript of Bench Trial, Trial Day 2, p.154. A graduate of Monmouth University, Defendant was a federal employee at the time, a disaster loan specialist for the Small Business Administration. Id. At 154-55. She was formerly an intern with the Federal Trade Commission as a college student. Id. at 155.

Defendant awoke the day of 06 January 2021 and traveled to the Ellipse, where President Trump was to make his speech. Id. Defendant had traveled to D.C. for the rally in order to be with

like-minded people, to protest the stolen election, and "to observe what [she] thought was the constitutional process of our 12th Amendment." Id. at 163. Defendant had no intention of stopping the counting of the electoral ballots or of disrupting the process in any way. Id. at 162-63.

About 8:00am, she went through security to see the speech and met up with a friend from Facebook. Id. at 157. The Defendant stayed through the majority of the President's speech but left early in order to avoid the crowds. Id. at 158. Defendant had registered to attend a protest called "Wild Protest," which was a permitted protest "directly endorsed" by President Trump. Id. The Defendant walked from the Ellipse down Constitution Avenue to Pennsylvania Avenue to the Peace Monument behind the Capitol Building. Id. at 159. Defendant traveled around the northwest to the Senate Wing door. Id. at 160. In the course of walking this route, Defendant's friend, Ms. Jaycee Cook, informed the Defendant that the Capitol Building had been evacuated. Id. In her testimony at trial, the Defendant stated that she received a phone call from Ms. Cook, id., but in actuality she had received a text message to this effect. Ex. 4, Defendant's Objections to Presentence Investigation Report: Affidavit of Anna Lichnowski, Appendix D (T-Mobile records), Appendix F (Affidavit of Jaycee Cook).

Upon Defendant's arrival at the Capitol Building, the terrace was overrun by people. Ex. 2, Transcript, Day 2, p.162. A member of the crowd was waving and pointing to the staircase, where Defendant would eventually ascend to the upper terrace. Id. Defendant saw that crowds of people were entering through the Senate Wing doors. Id. at 164. After lingering for a while on the outskirts of the terrace, Defendant eventually followed the movement of the crowd, which led into the Senate Wing. Id. Defendant, who is 5'6, could not see through the crowd to the police line at the doors and did not, therefore, witness any protestors pushing their way into the Capitol Building. Id. at 164-65. The thickness of the crowd and the inability to see through it was confirmed by

3

Officer Pias in his testimony at trial, who could not himself see Defendant through the crowd. Ex. 1, Transcript of Bench Trial, Trial Day 1, p.84; cf. Day 2, p.165.

Defendant did not see any posted signs saying that the building was restricted and did not see any cordon of police officers. Ex. 3, Transcript of Bench Trial, Trial Day 3, p. 5. Upon entering the Capitol Building, the Defendant saw the broken door and the broken glass on the ground and heard a fire alarm. Day 2 at 166. Protestors inside, however, were yelling to the crowd that they were working with the police and were directing the flow of the crowd. Id. She followed the direction of the police and their intermediaries by walking toward the Crypt. Id. at 167; cf. Day 3 at 7 ("we were certainly being channeled into the Crypt by the police"). Defendant would have exited the Capitol Building at that point had she been directed, but she was directed with the crowd to go to the Crypt, not to exit the Building. Day 3 at 8. The entire time, Defendant was under the impression that the protestors were working with the police. Id. at 11.

Once inside the Crypt, Defendant sat down in front of the New Jersey statue. Id. at 14. Officer Adonis of the USCP passed her several times before apparently asking her to move. Id. at 14-17. Once Officer Adonis appears to ask Defendant to move, she did move, but was unable to exit the Building due to the crowd. Id. at 17-19. Defendant exited the Memorial Doors. Id. at 21.

The Defendant's case is distinguishable from those deserving of incarceration because she did not obstruct the police or engage in any acts of violence. The Defendant did not cut, take down, or otherwise remove barriers, fencing, or signs. The signs and barriers had been removed or taken down before her arrival at the Capitol. Neither did Defendant witness others tearing down or removing signs or barricades, breaking windows, pushing through the police line, or anything else. Due to her late arrival to the Capitol grounds, the Defendant was unable to discern that the grounds were restricted or closed.

4

Once inside the Capitol Building, the Defendant sought to follow the instructions of the police. No dispersal order was given to Defendant or those around her, and no bullhorns or PA systems were used by the police. A clearly intelligible dispersal order and advised routes for leaving the area may have helped to clarify the situation for the defendant at the time. In any event, the when the police advised the Defendant to travel toward the crypt, the Defendant complied with the instruction. When in the crypt she was instructed to exit the building, she complied once she was able.

II.     **History and Characteristics of the Defendant**

The Defendant is 37 years of age. Her mother died when she was 18 years old. Her father, a retired physician who specialized in internal medicine, resides in New Jersey, where the Defendant was born and raised. Having worked as an entrepreneur and small businesswoman in New Jersey, Ms. Lichnowski works as a tour boat captain in her new home in Florida. In her spare time, she studies jiu jitsu, is a certified scuba diver, and a licensed boat captain.

From early adolescence, after her parents' relationship became unstable, Defendant was subject to drug, alcohol, verbal, and emotional abuse. These issues were rooted in untreated mental health issues in Defendant's father, which significantly worsened throughout her adulthood, especially after the death of her mother when she was just 18 years old.

Between the ages of 18 and 21, the defendant emulated the destructive behaviors she was exposed to as an adolescent but was unaware that she was struggling to cope with her own mental health issues that she did not know about yet. She experienced two drug overdoses that almost claimed her life, but voluntarily went to rehab for her 21st birthday because she wanted a life that was different from the one she had known.

Even as the defendant was struggling with untreated mental health issues and addiction,

she maintained employment (and was promoted) and successfully graduated college with a high grade point average. Her mother having passed away, the Defendant made an extremely mature and selfless decision to sacrifice the life she was starting in Florida to return to New Jersey so that she could take responsibility for the well-being of her sisters and ensure that they would become productive members of society. Despite her deteriorating mental and physical health, she empowered her younger sisters to become successful women who graduated college, started successful careers, and moved out-of-state to lead better lives.

The Defendant has been on an intentional path of transformation since she got help at age 21. She has no criminal record and was never mandated by any court to seek help. It was and still is her choice to lead a healthy, law-abiding, purposeful life. She comes from a law enforcement family who is very proud of the person she has become today.

Her path started with a 30-day inpatient treatment program when she was 21. She then attended Alcoholics and Narcotics Anonymous meetings for several years where she helped many others struggling with addiction. Her journey through sobriety led her to physicians who diagnosed her with ADHD, C-PTSD, and sexual trauma. She sought therapy and has undergone treatment over the years that have significantly improved her physical and mental health and removed her dependence upon any prescription medications. She continues to invest in her physical and mental health by being an avid athlete, and she mentors young women in sports. Cf. Ex. 5, Letters to the Court (Letters of Angalise Martinez and Tina Smith).

The defendant had a security clearance for a federal agency Washington, D.C. when she interned there her senior year of college. Id. (Letter of Bernadette Harding). She is currently a qualified candidate for a federal Merchant Mariner Credential.

Defendant is in a committed and healthy relationship with her fiancé for almost thirteen

6

years. Id., Letter of Brent Miller. It is worth noting that her fiancé immediately returned calls to the probation office on her behalf, but his calls were not returned.

 She owns a home with her fiancé and is the homemaker around her full-time role in leading several businesses. Defendant has started and successfully leads several businesses since she graduated college. Cf. Id. (Letter of Anthony Caruso). Defendant is an integral leader in her current business partnerships. Cf. Id. (Letter of Robert Chiodini). Defendant is a positive influence on her colleagues and employees. Cf. Id. (Letter of Natasha Young). She was even highlighted on CNN as an entrepreneur helping the local business community that was recently impacted by hurricanes in Florida. Defendant also caretakes for elderly family members in and out of state.

 The Defendant has, by all accounts, rehabilitated herself from a past life that could have certainly led to a life of crime. She has dedicated half of her adult life to achieving her potential personally and professionally. She would not risk the life she has to commit crimes in the future.

 The Defendant has two uncles and a cousin in law enforcement. One of those uncles, Andrew Lichnowski, has written a letter to the Court in which he assures the Court that Defendant would refrain from criminal activity in the future. He also notes that Ms. Lichnowski raised her two younger siblings after their mother's death and worked her way through college.

 Numerous other persons besides Andrew Lichnowski have written letters on behalf of Ms. Lichnowski to assure the Court that the Defendant is in no danger whatsoever of recidivism and that there is no need to protect society from further crimes of the Defendant. Among these persons is Ms. Angalise Martinez, a teenage girl whom the Defendant mentors in her jiu jitsu academy in Florida. Cf. Id. (Letter of Angalise Martinez). Mr. Seth Keshel, as friend and business colleague of the Defendant, has written a letter to the Court extolling Ms. Lichnowski's contributions to

society and assuring the Court that she will continue to be a productive member of society and not commit any crime. Cf. Id. (Letter of Seth Keshel).

Numerous letters to the Court have noted Ms. Lichnowski's remorse, including Mr. Adam Hughes, Anthony Caruso, Esq., Natasha Young, and Robert Chiodini. Cf. Id. (Letters of Hughes), Caruso, Young, Chiodini. It should not be held against the Defendant that she contested the Government's interpretation of the statutes and challenged the Government to meet its burden in proving that her conduct was prohibited by the statutes. The exercise of Defendant's natural and constitutional rights to trial, to due process, to the guarantees of a thousand years of Anglo-American law, cannot possibly be interpreted as a refusal to accept responsibility, as the Government alleges. As indicated by the letters to the Court, Ms. Lichnowski has clearly accepted responsibility and shown remorse to those closest to her. She should not be penalized for failing to make an obsequious show of submission to the Federal Government.

The more than twenty letters to the Court from family members, friends, business colleagues, and mentees paint a picture of an admirable woman who has made and who continues to make outstanding contributions to society. Ms. Lichnowski is praised for her "strength," "responsibility," "dedication to family," and for helping others, id. (Letter of Andrea Melone); for being "trustworthy," "dependable," "empathetic," "compassionate," an "active member in the community," and a "productive member of society," id. (Letter of Angalise Martinez); as a respectable businesswoman who overcame a difficult childhood, cf. id. (Letter of Anthony Caruso), Esq.; for demonstrating "genuine kindness," a "deep love for family," a "strong moral ethic," and a "willingness to help others," and for being "an inspiration" and "a positive influence," id. (Letter of Barbara Romas); for being a "law-abiding citizen," cf. id. (Letters of Bernadette Harding, Jennifer Bollinger, Mary Ellen Viola); for having "a heart of gold," id. (Letter of Jennifer

8

Bollinger); for being "hardworking" and "loyal," id. (Letter of Leo Zaccari); for her "strength of character," her "sincerity," her "fairness," and for being "loyal to the highest moral principles," id. (Letter of Bernadette Harding); for her "unwavering integrity" and "high moral character," cf. id. (Letter of Robert Chiodini, calling Ms. Lichnowski a "TRUE HERO").

Three young ladies have written letters to the Court pleading for leniency for their mentor: Angalise Martinez and Tina Smith, whom Defendant mentors in jiu jitsu, and Natasha Young, Defendant's colleague and first mate on the boats. The Defendant's fiancé, as well as several members of his family, have written letters to the Court, as well. Her fiancé's parents and brother have all attested to the strength of Ms. Lichnowski's character and the relationship between Ms. Lichnowski and her fiancé. Cf. Id., Letters of Brenton Miller, James and Heather Miller, Paige Hackett.

Numerous persons would be negatively impacted by the incarceration of Defendant. Not only the Defendant herself and her fiancé and family, but her mentees and the community at large would be worse off for losing Ms. Lichnowski, no matter how long. As one letter to the Court has put it, "our world would be a better place if Anna were allowed to expand her community service efforts at [the Court's] direction." Id., Letter of Mary Ellen Viola.

### III.   Legal Standard Applicable to Sentencing

A district court should begin all sentencing proceedings by correctly calculating the range of the sentence under the United States Sentencing Guidelines. *Rita v. United States*, 551 U.S. 338, 347-348 (2007). The guidelines, which are not mandatory, *United States v. Booker*, 543 U.S. (20050, are "a starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 51 (2007). They "are not the only consideration, however." *Id*. After giving the parties "an opportunity to argue for whatever sentence they deem appropriate, the district judge should then

consider all of the § 3553(a)1 factors to determine whether they support the sentence requested by the party." *Id*. The district judge "must make an individualized assessment [of the appropriate sentence] based on the facts presented." *Id*.

IV. **Sentencing Guidelines Calculation**

The Defendant was found Guilty at a bench trial on four Counts: Count 1 of Entering and Remaining in a Restricted Building, in violation of Title 18, United States Code, Section 1752(a)(1); Count 2 of Disorderly and Disruptive Conduct in a Restricted Building, in violation of Title 18, United States Code, Section 1752(a)(2)); Count 3 of Disorderly Conduct in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(D); and Count 4 of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G).

   a. Base Offense Level

The Presentence Investigation Report states that "[t]he Guideline for USSG § 1752(a)(2) offenses is found in § 2A2.4 of the guidelines, and the base offense level is 10. § 2A2.4(a)." The report is in error, however, because it bases the offense level of Count 2 on USSG § 2A2.4 instead of § 2B2.3. The latter clearly applies, since it expressly refers to trespassing on "restricted grounds." § 2A2.4 does not apply because it is premised on conduct that obstructs a police officer – an act which Defendant did not commit. §2A2.4 ordinarily refers to the offense of assault on a law enforcement officer (18 U.S.C. § 111) or obstructing or interfering with an officer in the performance of a duty during a civil disorder (18 U.S.C. § 231(a)(3)). Defendant is not charged with those offenses, and there is no evidence that she committed those crimes. Count 2 is limited to disorderly conduct in a restrictive area; it does not fit the conduct described under §2A2.4. The base offense level for Count 2, therefore, should be 4, not 10.

### b. Objection to Adjustment for Obstruction of Justice

The Presentence Investigation Report added 2 points to the calculations as an "adjustment for obstruction of justice," stating:

> [T]he defendant intended to deceive the Court when testifying. Regarding the defendant's testimony at trial, "Judge Walton explained that he did not find Lichnowski's testimony to be 'convincing.' To the contrary, Judge Walton stated that defendant Lichnowski was 'not truthful' and 'sought to deceive the Court' while testifying. Thus, the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct or a closely related offense; therefore, a two-level increase applies. USSG §3C1.1

Defendant objects to this characterization and to the addition of two (2) points to the calculations. The report erroneously determines that Defendant obstructed justice by introducing false evidence into the trial from the witness in New Jersey. The Commentary to USSG § 3C1.1 reads:

> In applying this provision, with respect to alleged false testimony or statements by the Defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct.

Three and a half years after the fact, it is not mysterious or a cause for suspicion that a Defendant would misremember how she received a certain piece of information, whether by phone call or by written message. In the Affidavit of Defendant, attached to Exhibit A, Defendant avers that her recollection of receiving a phone call from Jaycee Cook was incorrect, and that the communication from Jaycee Cook was in the form of a text message, not a phone call. Cf. Ex. A, Affidavit of Anna Lichnowski ¶¶ 14-33. This is supported by documentation from T-Mobile and by the Affidavit of Jaycee Cook. Exhibit A.

11

The Government notes in its Sentencing Memorandum that the screenshots provided by Ms. Cook are not smoking gun text messages or screenshots of actual news stories about the Capitol Building itself being evacuated. Dckt. 67, pp.14-15. The Government attributes this lack of direct evidence as evidence that Ms. Lichnowski is somehow refusing to accept responsibility for being at the Capitol. Id. at 15. Contrary to the Government's position, what is amazing that there is any evidence at all from January 2021 in either Ms. Cook's or the Defendant's possession. The Defendant and Ms. Cook are not Government attorneys, they are not archivists, and they are not private detectives. To imagine that they would store text messages for three and a half years in the off-chance that their texts and screenshots would be evidence in a federal criminal case against them would be insane. This is not how normal people operate, and it is disingenuous for the Government to act as if the ladies' neglect to preserve something they did not know would be evidence years later is a moral failing on their part.

The Court should not impose an enhancement of 2 points, because the Defendant's inaccurate testimony about the evacuation of the Capital Building is the result of mistake and faulty memory and was not an attempt to deceive or obstruct the Court.

### c. Adjustment for Acceptance of Responsibility

The Court should reduce the base level offense by 2 points for Defendant's acceptance of responsibility. "Conviction by trial . . . does not automatically preclude a defendant from consideration for such a reduction." Commentary, USSG §3E1.1.

Several of the letters to the Court, written by family, friends, business colleagues, and mentees of the Defendant state spontaneously that the Defendant has indicated to them her remorse for becoming involved in a criminal activity. Defendant will state the same at the upcoming hearing herself.

The Government emphasizes the Court's finding that the Defendant testified dishonestly because she misremembered being told by phone call rather than by text message that the Capitol Building was evacuated. This has been addressed at length above. Moreover, the Commentary to USSG §3E1.1 reads in relevant part:

> truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully ad-mitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous

Defendant did fully admit the relevant conduct. There was never any question that Defendant admitted her presence in Washington, D.C.; that she admitted her entry into the Capitol Building; that she frankly admitted to her conduct therein.

More to the point, the Government's crusade about whether or not Defendant received information that the Capitol Building has already been determined to be irrelevant by the Court, which has determined that Defendant's knowledge of the Vice President's presence inside the Capitol Building is not an element of the offense of entering restricted grounds. So whether the Capitol Building was evacuated or not; whether Defendant knew of the evacuation or not; whether she received word of its evacuation or not; whether she received that word via phone call or text message; is ultimately irrelevant. Ergo, this is not relevant for consideration in determining whether to apply a two-point reduction.

What is relevant is her admission to entering the Building and her actions therein. What is relevant is that her challenge to the Government was a constitutional challenge well within her

right as an American citizen to a fair trial. What is relevant is her statements of remorse to those closest to her, though she did not elect to make an obsequious show for the Government. All of these factors weigh in Defendant's favor for a two-point reduction.

### d. Probation Suitable for Zero-Point Offender

At a base offense level of 4, the Defendant is in Zone A of the Sentencing Table. Given that the Defendant has 0 criminal history points, the criminal history category is I, and the guidelines' sentence is zero (0) to six (6) months' imprisonment. USSG 5B1.1 outlines the criteria for imposition of a term of probation:

> (a) Subject to the statutory restrictions in subsection (b) below, a sentence of probation is authorized if:
>
> (1) the applicable guideline range is in Zone A of the Sentencing Table; or
>
> (2) the applicable guideline range is in Zone B of the Sentencing Table and the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention as provided in subsection (c)(3) of §5C1.1 (Imposition of a Term of Imprisonment).

Whether the 2 points are added for obstruction or not, the applicable guidelines range places the Defendant in Zone A of the Sentencing Table, which authorizes a sentence of probation.

However, if the Court applies the base level of 10 instead of 4 for Count 2 and adds the 2 points for obstruction (while deducting 2 points for being a zero-point offender), Defendant would be in Zone B. For individuals in Zone B, a sentence of probation is authorized if the Court "imposes a condition or combination of conditions requiring intermittent confinement, community confinement or home detention as provided in subsection (c)(3) of § 5C1.1 (Imposition of a Term of Imprisonment)." U.S.S.G. § 5B1.1(a)(2). Subsection (c)(3) of § 5C1.1 states:

14

> If the applicable guideline range is in Zone B of the Sentencing Table, the minimum term may be satisfied by—
>
> > a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in subsection (e).

Subsection (e) of § 5C1.1 substitutes intermittent confinement, community confinement, or home detention for imprisonment day-for-day.

Two statutes bear mentioning. First, under 28 U.S.C. § 994(j), Congress established a preference for a sentence other than imprisonment in cases where the defendant is a "first offender". That subsection states:

> The Commission shall ensure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.

The defendant is "first offender" under this subsection.

Second, 18 U.S.C. §3561 provides that a defendant may be sentenced to a term of probation unless 1) the defendant has been found guilty of a Class A or Class B felony; 2) the offense is one for which probation has been expressly precluded; and 3) the defendant is sentenced at the same time to a term of imprisonment for the same or different offense that is not a petty offense. None of those are in play. Thus, a term of probation is clearly authorized in this case.

The Presentence Investigation Report states:

> The defendant received an adjustment under USSG §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table. Therefore, a sentence other than a sentence of imprisonment, in accordance with USSG §5C1.1(b) or (c)(3) is generally appropriate. USSG §5C1.1, comment. (n.10).

15

Paragraph 103. Defendant agrees with this adjustment and contends that the application guideline range is in Zone A.

If the Court were to decide that the guidelines provide the correct sentence and impose a term of probation with one of the conditions specified in U.S.S.G. § 5B1.1(a)(2), the most fitting condition is "home detention." This follows from an "individualized assessment of the facts presented in the case" and the factors outlined in 18 U.S.C. § 3553(a):

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide for just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The kinds of sentences and the sentencing range established for the applicable category of offense and category of defendant under the U.S.S.G.;

(5) Any pertinent policy statement issued by the Sentencing Commission;

(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

(7) The need to provide restitution to any victims of the offense.

Concerning imposition of probation as opposed to incarceration, Part B of Chapter Five of USSG, entitled "Determining the Sentencing," states:

16

> Probation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentences, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant.

Federal Sentencing Guide Handbook, 2020-2021 Ed., p. 1585. A sentence of probation in this case will fully achieve the statutory purposes of sentencing. The letters to the Court well establish that the public is in no danger whatsoever of further crimes by Defendant, who does not need incarceration to deter her from future criminal acts. These letters, some of which are from law enforcement, demonstrate Ms. Lichnowski's respect for the law and note that incarceration would punish the community at large as much as it would punish the Defendant.

In summary, the Defendant entered the Capitol Building but did not engage in any violent acts or obstruction of the police. Defendant is a Zero-Point Offender with a Criminal History Category of I; is a very low risk of another crime; is in Zone A (arguably Zone B) of the Sentencing Table; and that Defendant's actions inside the Capitol building were *de minimis* and did not involve vandalism, violence, or obstruction of the police. Moreover, the Defendant has fully complied with all terms of her pretrial release and is a good candidate for probation. More than twenty (20) people have written letters to the Court attesting to the good character of the Defendant and many advised the Court that she would never intentionally commit a crime and is absolutely not at risk of committing a crime. Moreover, the Defendant has fully complied with all terms of her pretrial release and is a good candidate for probation.

Applying an individualized assessment of the facts presented in this case and the other relevant sentencing factors, a sentence of probation is the appropriate sentence for this defendant, and the Court is urged to impose it.

Respectfully submitted,

**ROBERTS & WOOD**

  /s/ Terrell N. Roberts
Terrell N. Roberts, III
DC Bar No. 965061
*Attorney for Defendant*
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737
(301) 699-0764
(301) 699-8706 Fax
troberts@robertsandwood.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was electronically filed on November 6, 2024, via the CM/ECF File & Serve system, and an electronic copy was e-served on:

Eric Boylan, Esq.
Assistant United States Attorney
Office of the United States Attorney, District of Columbia
555 4th Street, NW
Washington, D.C. 20530


  /s/ Terrell N. Roberts
Terrell N. Roberts, III

**Exhibit List for Defendant Anna Lichnowski's Sentencing Memorandum**

Exhibit 1   Transcript of Bench Trial, Day 1

Exhibit 2   Transcript of Bench Trial, Day 2

Exhibit 3   Transcript of Bench Trial, Day 3

Exhibit 4   Defendant's Objections to Presentence Investigation Report

Exhibit 5   Letters to the Court