```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3    United States of America,     ) Criminal Action
                                    ) No. 23-cr-341
 4                  Plaintiff,      )
                                    ) SENTENCING HEARING
 5    vs.                           )
                                    ) Washington, DC
 6    Anna Lichnowski,              ) November 8, 2024
                                    ) Time:  11:05 a.m.
 7                  Defendant.      )
      _____
 8
                   TRANSCRIPT OF SENTENCING HEARING
 9                         HELD BEFORE
                 THE HONORABLE JUDGE REGGIE B. WALTON
10                   UNITED STATES DISTRICT JUDGE
      _____
11
                        A P P E A R A N C E S
12
      For Plaintiff:      Jake Struebing
13                        U.S. ATTORNEY'S OFFICE
                          601 D Street NW
14                        Washington, DC 20530
                          (202) 252-6931
15                        Email:  Jake.struebing@usdoj.gov

16    For Defendant:      Terrell Roberts, III
                          ROBERTS & WOOD
17                        6801 Kenilworth Avenue
                          Suite 202
18                        Riverdale, MD 20737
                          (301) 699-0764
19                        Email:  Troberts@robertsandwood.com

20                        Augustus Sol Invictus
                          THE INVICTUS LAW FIRM, P.A.
21                        424 E. Central Blvd.
                          #731
22                        Orlando, FL 32801
                          (407) 900-2848
23                        Email:  Invictuspa@protonmail.com
      _____
24
      Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
25                             Official Court Reporter
```

```
1      *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *
2              THE COURTROOM DEPUTY:  Your Honor, we're on the
3      record for United States of America versus Anna Lichnowski,
4      criminal case number 23-CR-341.
5              Counsel, please come forward and note your appearance
6      for the record, beginning with the government.
7              MR. STREUBING:  Good morning, Your Honor.  Jake
8      Struebing on behalf of the United States.
9              THE COURT:  Good morning.
10             MR. ROBERTS:  Good morning, Your Honor.  Terrell
11     Roberts on behalf of Anna Lichnowski, together with Augustus
12     Invictus.
13             THE COURT:  Good morning.
14             THE PROBATION OFFICER:  Good morning, Your Honor.
15     Sheree Baker on behalf of the probation office.
16             THE COURT:  Good morning.
17             Okay.  This matter is before the Court for
18     sentencing.  And in preparation for the sentencing, I did
19     review the information that was filed in this case.  Also, the
20     final presentence investigation report dated October 8th, 2024.
21     Also, the sentencing recommendation from the probation
22     department.  Also, the government's notice of filing of
23     exhibits pursuant to Local Rule 49.  Also, the government's
24     sentencing Exhibit 1, which is a USB drive, and also Exhibit 2,
25     which is also a USB drive.  Also, the defendant's sentencing
```

 1    memoranda, along with transcripts of day one, two, and three of

 2    the trial.  Also, the defendant's objections to the presentence

 3    investigation report.  Also, 21 letters submitted on behalf of

 4    the defendant.  Also, an affidavit of fact from the defendant,

 5    plus, appendix to that, A, B, C, D, E and F.

 6            Anything else I should have reviewed for the

 7    sentencing from the government counsel?

 8            MR. STREUBING:  Not from the perspective of the

 9    government, Your Honor.

10            THE COURT:  Defense?

11            MR. INVICTUS:  No, Your Honor.

12            THE COURT:  In reference to the report, there are a

13    number of objections to the factual scenario set forth in the

14    report.  I've never had a situation like this, and the only

15    thing I would be prepared to do is to -- I mean, the government

16    has its position, the defense has its position, the facts are

17    what they are -- is to just attach as an addendum to the report

18    the defendant's positions as to what purportedly the evidence

19    was.  But I'll hear from counsel regarding that.

20            MR. INVICTUS:  Should we stay here or go up there?

21            THE COURT:  (Indicating.)

22            MR. INVICTUS:  Yes, sir.

23            So, Your Honor, concerning the factual disputes, so

24    the main thing we're talking about is the T-Mobile records.

25            THE COURT:  The what?

1          MR. INVICTUS:  The T-Mobile records, the phone

2     records, the screenshots that were submitted, the affidavit by

3     Jaycee Cook, all of this concerns Your Honor's finding at the

4     trial that Ms. Lichnowski had attempted to deceive the Court by

5     saying that she had received a call on her way to the Capitol

6     building.  It turns out it was not a call, and Ms. Lichnowski,

7     you know, upon reviewing these records, says it was a text.

8     And she was in fact informed of these things, just the method

9     of being informed, that's what's at issue.

10          We have the affidavit of Jaycee Cook, the lady that

11     this came from.  We have screenshots from Jaycee Cook.  We have

12     the records which the government has already submitted, the

13     T-Mobile call records.  And I don't know the government's

14     position on this, we haven't spoken with Mr. Struebing since

15     the filing of all these documents, but I would ask, defense

16     would ask that if this is going to be an issue where we are

17     going to argue these additional two points based on this

18     information, the defense would ask for an evidentiary hearing

19     so that we could bring Ms. Cook down here to testify.

20          THE COURT:  Government have a position?

21          MR. STRUEBING:  Yes, Your Honor.  Let me start with

22     the objections to the PSR, if I may.  The defendant's

23     objections to the PSR -- and they are numerous -- are nothing

24     more than an attempt by the defendant to relitigate this

25     Court's factual findings and the facts established at trial.  I

1    think the Court's proposed resolution, to essentially attach

2    them to the PSR, I think that's acceptable.

3            With respect to the evidentiary hearing and the

4    affidavits before the Court, I think the Court considered those

5    affidavits and there's no need for an evidentiary hearing.  Our

6    position is that those affidavits don't really prove anything.

7    They don't prove that the screen shots that were taken, the

8    affidavits were ever even communicated to Ms. Lichnowski.  So I

9    think the Court can take this at face value and consider them,

10   but there's no need for an evidentiary hearing.

11           THE COURT:  I don't see a need for that.  I agree

12   with the government, it's an attempt to relitigate what was

13   already litigated during the trial.  And the evidence was

14   presented as to what exactly occurred and how these

15   communications were made to her, and that's all in the record.

16   And I made my, you know, determinations based on what the

17   record was.

18           So I'm not prepared to relitigate what already has

19   been litigated during the trial itself.  But, as I said, I will

20   attach to the report what has been submitted by way of

21   objections, for what it's worth.

22           I mean, I don't know if those factual determinations

23   have any impact whatsoever on the case, other than being a part

24   of the record.  But I don't -- you know, in my experience, you

25   know, prior presentence investigation reports really don't tend

1    to have any impact on future cases, assuming there is another

2    case.  If she did receive a prison sentence, obviously that

3    might be considered, although I doubt very seriously it would

4    have any impact on what her classification was, just based on

5    what the dispute is.

6          So I don't see what real legal impact or practical

7    impact the dispute really has on her situation.  But as I said,

8    I will make a part of the presentence investigation report, as

9    an attachment, the objections and positions advanced by the

10   defendant.

11         MR. INVICTUS:  If I may briefly respond, Your Honor?

12         THE COURT:  Yes.

13         MR. INVICTUS:  So I'd just like to point out, the

14   government's saying that we're trying to relitigate the facts

15   of the case.  That's not the defense's intent.  We're not

16   trying to overturn the conviction in that sense or to say that

17   she did or did not meet the elements of that crime.  The sole

18   reason for us bringing this into the sentencing hearing is that

19   the government has arguing for an increase of two points based

20   on obstruction of justice, which is in the PSR report.  And our

21   position is Ms. Lichnowski did not attempt to deceive the

22   Court.  This was a good faith mistake.  And so if that is going

23   to increase her sentence by -- her sentencing calculation by

24   two points, we think it's essential --

25         THE COURT:  Obviously I'll hear from you and hear

1    from the government in reference to that.  I'll --

2             MR. INVICTUS:  Yes, Your Honor.

3             THE COURT:  -- make a factual determination as to

4    whether that two-point increase is appropriate, based upon her

5    having essentially engaged in some type of obstruction of

6    justice.  So I obviously will entertain any argument or

7    evidence in reference to that.

8             MR. INVICTUS:  Yes, sir.  Thank you.

9             THE COURT:  With that, are there any other

10   objections, other than addressing this issue regarding whether

11   that two-point increase is appropriate based upon alleged

12   obstruction?  Anything else we need to discuss, other than

13   that, regarding the report?

14            MR. STRUEBING:  Not regarding the report, Your Honor.

15   I do understand the defense's additional objections to

16   calculation of the guidelines, but we can address those.

17            THE COURT:  Right.  I obviously have to make a

18   guideline assessment as to the accuracy of it, and I will do

19   that.

20            Okay.  Then in reference to the guidelines, I'll hear

21   from the defense as to why the probation department's and the

22   government's position regarding the guidelines is inaccurate.

23            MR. INVICTUS:  Yes, sir.  So, Your Honor, concerning

24   the base level offense, I said in the sentencing memorandum

25   that it should be a 4 because this is more a trespassing case.

1    I understand the *Nassif* case cited by the government says that

2    this should be a base level offense of 10.  So we're not going

3    to war on that, we just need to preserve that for the record

4    because we think the *Nassif* case was wrong.

5          So we are understanding that we're going to be

6    starting at a base level of 10.  The question then is what are

7    we adding and what are we subtracting?  So the PSR report, we

8    are in agreement that there should be --

9          THE COURT:  Let me say, before -- I don't mean to cut

10    you off.  But if there's a question as to whether it should be

11    a 4 or a 10, I think I need to address that.  And obviously

12    I've considered the arguments in reference to that, and I would

13    not consider this to be a simple trespassing.  This was an

14    event in which individuals who didn't like the 2020

15    presidential election result sought to disrupt the ability of

16    the Electoral count to be conducted by the Congress, and

17    through their collective action in fact did inhibit that

18    process from going forward.

19          So I don't see this as just a simple trespassing

20    case.  This is a lot more than that because collectively a

21    group of people sought to subvert the will of the American

22    public regarding who should be the next president back in 2020.

23          MR. INVICTUS:  Yes, sir.  I understand Your Honor's

24    position.  I understand that -- I'm familiar with the language

25    in the *Nassif* case, I understand that.  We're just saying, for

1    the purpose of the record, that Ms. Linchnowski -- I understand

2    you're saying collectively this was the case, but I think

3    Ms. Lichnowski personally did not intend that and I don't think

4    the record showed that she did.  So I just wanted to preserve

5    that.  I understand your position, Your Honor.

6         THE COURT:  Very well.  I understand what you're

7    saying, but I just don't see how I can conclude, based upon the

8    evidence, that the people who were involved did not intend to

9    do what they in fact accomplished, and that was to delay the

10   ability of the Congress to do its business that day.

11        So I understand your position, but I do not agree

12   that this is merely a trespassing.  And, therefore, will

13   conclude that the probation department has accurately assessed

14   that the base offense level is 10.

15        MR. INVICTUS:  Understood, Your Honor.

16        THE COURT:  Okay.

17        MR. INVICTUS:  In that case, all we're arguing today

18   is the addition and subtraction of points.  And we would agree

19   with the PSR report that Ms. Lichnowski is a zero-point

20   offender, that two points should be reduced.  I know the

21   government is going to object to that, at least they did in

22   their sentencing memorandum.  But we would agree with that.

23        THE COURT:  Let me just address each point.  Why is

24   the government of a view that the zero-point reduction would

25   not be appropriate, since she doesn't have any prior record?

```
1              MR. STRUEBING:  Your Honor, to be clear, the
2     government concedes that Section 4C1.1, zero offender provision
3     applies to Ms. Lichnowski.  If that does apply, Ms. Lichnowski,
4     with a base offense level of 10, that means her guidelines
5     range is 6 to 12 months.  We've been making a standard request
6     across all of January 6 cases for an upwards variance to offset
7     the two-point reduction, 4C1.1, because January 6th was a
8     violent riot that threatened the lives of members of Congress,
9     did irreparable harm to the transfer of power in this country,
10    and overall I think we would argue for an upward variance on
11    the back end of the guidelines.  But the government does
12    concede that Section 4C1.1 does apply to Ms. Lichnowski.
13              THE COURT:  Very well.
14              MR. INVICTUS:  Your Honor, that being the case, we
15    would object then to an upward variance.  If Your Honor wants
16    to stay on that topic, our position would be that the
17    government says in the memorandum that this thing about 4C
18    being about zero-point offenders is about preventing
19    recidivism.  The government points out that the vast majority
20    of the J6 defendants are law-abiding citizens, there is no
21    danger of recidivism.
22              And to cite that in the sentencing memorandum and to
23    say, well, there's no reason to believe that Ms. Lichnowski
24    even needs this two-point reduction because she's not in danger
25    of recidivism, seems to be saying that we should vary upwards
```

1    by two points because she's a law-abiding citizen, which seem

2    completely against the entire point of having a zero-point

3    offender reduction.  That will be our argument against the

4    variance.

5           THE COURT:  So the government is saying that she's

6    entitled to that reduction.  So what are you arguing in

7    reference to why, in these type of cases, there is some

8    implication in reference to that?

9           MR. INVICTUS:  You're asking the government, Your

10   Honor?

11          THE COURT:  Yes.

12          MR. STRUEBING:  Your Honor, if I may proceed?

13          THE COURT:  Yes, go ahead.

14          MR. STRUEBING:  Our point is merely that January 6

15   was a violent riot.  Obviously, a number of these misdemeanor

16   defendants are first-time offenders, they don't have a criminal

17   history.  They have zero points.  But given the gravity of the

18   situation of what happened on January 6, we have requested,

19   across all of the zero-point offender cases, a two-point

20   departure to offset the application of 4C1.1.

21          THE COURT:  Two-point departure upwards?

22          MR. STRUEBING:  Upwards, yes.

23          THE COURT:  That's based upon what subsection of

24   4C1.1?

25          MR. STRUEBING:  That's not based on any subsection of

1    4C1.1.  I think we would ask the Court in its discretion to

2    vary upwards.

3              THE COURT:  I mean, the sentencing guidelines

4    obviously are not mandatory.  And I'm looking at the

5    subsections of 4C1.1 and, as the government concedes, there's

6    no specific indication that an upward departure would be

7    appropriate, despite this newly adopted provision.  But I

8    think, you know, it is a criminal matter and, therefore, I

9    think the guidelines have to be, you know, strictly construed,

10   based upon the text that's in the guidelines.

11             And while there may be some other reason,

12   conceivably, in these type of cases to depart upward, I would

13   not conclude, at least in her case -- if we were talking about

14   someone who actually engaged in violence -- I mean, I'm not in

15   any way condoning what she did, but there is no evidence that

16   she either destroyed property, as many did, or actually engaged

17   in actual physical violence against the law enforcement

18   officials, as many did; that's not her case.

19             And I think we have to make the individual assessment

20   regarding these cases and not just universally take a position

21   regarding the cases just because of the nature of the events

22   involved that day.  So I would not agree with the government's

23   position in reference to that.

24             MR. INVICTUS:  Your Honor, there are just two other

25   areas for adding or reducing points, one being the obstruction

1  of justice being argued by the government and the other is our

2  argument that there should be a two-point reduction for

3  acceptance of responsibility.

4  So addressing the government's position first, they

5  had asked for a two-point increase for obstruction of justice.

6  And this is, as we said at the outset of the hearing, based on

7  Ms. Lichnowski testifying that she had received a call from her

8  friend, Jaycee Cook, explaining to her that the Capitol

9  building was being evacuated.  This turned out not to be the

10  case.  The government, upon cross-examination, pointed out that

11  actually these phone records were in UTC time, they were not in

12  Eastern Standard Time, and this call did not occur when

13  Ms. Lichnowski said it did.

14  But going back to speak with Jaycee Cook and figuring

15  out the timestamps on Jaycee Cook's phone for screenshots she

16  had taken, Ms. Cook filed an affidavit -- or, sent us an

17  affidavit that we filed with the Court saying that this is a

18  good faith mistake on the part of Ms. Lichnowski, that they

19  were in constant communication that day, that she did talk to

20  Ms. Lichnowski, sent her these screenshots, that at some point

21  in this conversation it was relayed to Ms. Lichnowski the

22  Capitol building was evacuated.

23  So that's the first point.  And the government's

24  position that, well, there are no smoking-gun text messages

25  that we can produce saying this is -- here it is, where

1     Ms. Cook said I told her that it was evacuated.  Our position

2     on that is that it's amazing that there's any evidence at all

3     from Ms. Cook, that she still has the screenshots.  Most people

4     don't have their text messages three and a half years later,

5     they don't preserve them thinking that they're going to be on

6     trial in several years' time.  And that's why we have statutes

7     of limitations, is that we all know evidence disappears.

8          And this was Ms. Cook's effort to provides us with

9     the evidence she did still have on her phone.  She filed the

10    affidavit, which I don't see how that can, in good faith, be

11    questioned by the government.  Again, unless we want to have an

12    evidentiary hearing on it.

13         But that's the one point, is that this is the

14    evidence we have and this is the position of Ms. Lichnowski,

15    that it was a text, they were in communication, she knew the

16    building was evacuated.

17         The second point of it is that no matter what, it

18    doesn't change the fact that she was there.  She admitted that

19    she was there.  There's no disputed fact that she entered the

20    building.  There's no lying on the stand about, well, I was

21    there for this reason or that reason, or I didn't do this and,

22    you know, this actually happened.  None of those factual

23    disputes were here.

24         This is the only factual dispute, is that she

25    received this call.  Turns out it was a text, she was just

1     plain wrong about it.  But that's not in bad faith and it's not

2     to deceive the Court, it's not to be dishonest with the Court.

3     It's certainly not to obstruct justice in the court.  So we

4     would argue against the government's position that we should

5     increase by two points for obstruction of justice.

6            THE COURT:  Government?

7            MR. STRUEBING:  Your Honor, the two-point enhancement

8     under Section 3C1.1 applies because the defendant provided

9     materially false information to this Court while testifying.

10    When delivering its verdict the Court explained that it found

11    Ms. Lichnowski's testimony to be not convincing.  That was in

12    the July 10th transcript.  The Court also found that

13    Ms. Lichnowski was not truthful and that, quote, she sought to

14    deceive the Court by the statements that she made, which were

15    not sufficient in accomplishing that objective.

16           The Court was likely referring to several falsehoods,

17    including the main dispute we have between the government and

18    the defense, which is her false claim that a phone call took

19    place at 2:35 p.m. on the afternoon of January 6.  I think

20    we're all in agreement that that phone call never took place.

21           Happy to address the affidavits, but I do think what

22    is telling is that even assuming this Court were to agree with

23    the defense that this phone call is not material or wasn't

24    material to its decisions, there are several other falsehoods

25    that the defendant made while on the stand.

1            She -- among other things, she claimed that her

2      seeing people climbing in broken windows and hearing an alarm

3      did not make her think that she was allowed -- not allowed to

4      be in the building.  She made an uncorroborated claim that a

5      senior U.S. Capitol Police officer gave her and others

6      permission to be in the building.  She made the claim that she

7      originally did not remember Officer Tyrone Adonis instructing

8      her to leave and then she changed her story on cross-

9      examination about that interaction.  And then there's also her

10     claim that she attempted to find an exit after Officer Adonis

11     instructed to her leave, even though the video evidence clearly

12     shows her picking up her things and just moving to another

13     pillar in the center of the Crypt, where she remained for about

14     ten minutes.  That's Government Sentencing Exhibit No. 2.

15            She stays there, and she likely would have stayed

16     there even longer than she did, but the Crypt is flooded with

17     police officers at 3:32 p.m., that's when the defendant picks

18     up her things and actually leaves the Capitol.

19            With respect to the evidence proffered by the defense

20     in the affidavits, she now claims that her testimony was the

21     product of mistake and confusion because she actually received

22     text messages, not a phone call.  I don't think the affidavits

23     really prove much of anything, Your Honor.  They don't suggest

24     that the Capitol had been evacuated and they certainly do not

25     substantiate the defendant's tenuous belief that Congress would

1    not be there when she approached the building and ultimately

2    unlawfully entered the building through the Senate wing doors.

3    And, in fact, the only evidence offered by the defense are the

4    screenshots from Miss Cook's phone.  There's no evidence

5    whatsoever that those screenshots were communicated to the

6    defendant on January 6th.

7            I'll just briefly go through those screenshots.  The

8    first screenshot references the evacuation of the James Madison

9    Memorial Building.  That's part of the Library of Congress, it

10   is not the Capitol building itself.  And at trial Ms.

11   Lichnowski claimed that the phone call led her to believe --

12   this is a quote -- led her to believe that the building was

13   evacuated and that something happened at the Capitol, a clear

14   reference to the Capitol building itself.  That's the July 9th

15   trial transcript at page 160 and page 162.

16           The second screenshot is from a news story discussing

17   how staffers from the Madison and Cannon buildings were

18   evacuated.  Again, that article makes no mention of the Capitol

19   building itself or the members of Congress that were inside at

20   that time.

21           And then, finally, the third screenshot appears to be

22   from an NBC broadcast and it has the chyron, "Protestors move

23   upstairs of Capitol as Congress debates Electoral College

24   objections."  As Congress debates Electoral College objections.

25   That screenshot proves the opposite of what the defendant is

1    claiming.  It proves that protestors were moving up the stairs

2    as members of Congress were inside the building at that time,

3    debating the objections to the Electoral College certification.

4    I think that directly contradicts the defendant's claim that

5    she believed that Congress had been evacuated and no longer in

6    session.

7          So I think this whole narrative about the phone call

8    is a charade, that even if this Court were to agree with the

9    defense that the phone call is not material, there are a number

10    of other falsehoods that the Court could rely on to apply

11    Section 3C1.1.

12          THE COURT:  Thank you.

13          MR. INVICTUS:  There are two main things I would like

14    to point out.  One is something that we've already cited in the

15    sentencing memorandum, and that is the commentary to the

16    guidelines 3C1.1.  And it says:  In applying this provision

17    with respect to alleged false testimony or statements by the

18    defendant, the Court should be cognizant that inaccurate

19    testimony or statements sometimes may result from confusion,

20    mistake, or faulty memory and, thus, not all inaccurate

21    testimony or statements necessarily reflect a willful intent to

22    obstruct.

23          And I think the fact that we do have, contrary to the

24    government's assertion, evidence that these text messages did

25    occur, the fact that she's testifying that there was a phone

1   call, as opposed to text messages, is not the end of the world

2   as far as inaccurate testimony.

3        She testified she received the information.  We now

4   have an affidavit from Jaycee Cook saying she received the

5   information, the only question is how.  And it's just not the

6   case that it's obstruction of justice to say I received a phone

7   call when in fact I received a text message and you're trying

8   to remember that on the stand three and a half years ago.

9        THE COURT:  I probably would agree with you if that's

10  the only evidence we'd be talking about in reference to whether

11  she did in fact provide false testimony because, as the

12  government says, there was a lot more that was said by her,

13  other than just that phone call, that I think bear on whether

14  she was being truthful.  And I would say, one of the most

15  significant, you know -- which wasn't really mentioned by

16  government -- pieces of evidence that resonated with me was she

17  said that she thought that there was a fire alarm going off and

18  it wasn't a warning or an indication that entry into the

19  Capitol was not permissible.  That I found incredible.

20       Someone, if they think a fire alarm was going off,

21  which would indicate that there's maybe a fire inside the

22  building, don't go in that building unless you have a death

23  wish.  So I found that incredible, that she thought it was a

24  fire alarm, but yet she went into the building anyhow.

25       MR. INVICTUS:  I understand, Your Honor.  I

1    understand Your Honor's, in this case, the trier of fact, and

2    that's a factual dispute, Your Honor doesn't find that

3    credible.  And, you know, the remedy, the outcome of that is

4    she's been found guilty.  That's the point of the trial.  We

5    have a factual dispute, the trier of fact doesn't believe it,

6    doesn't buy it, she's guilty.  Doesn't mean she's obstructing

7    justice though, that she's going to state this as she's going

8    to defend herself, otherwise anybody getting in that box is

9    going to be on the hook for a two-point increase for saying

10   something the trier of fact doesn't find credible.  And that's

11   the whole point of cross-examination, that's the whole point of

12   our adversarial system.  To say that that rises to the level of

13   obstruction of justice would be an error.

14        THE COURT:  You're saying that if the factfinder

15   concludes that there's an attempt to create a false indication

16   of what occurred in order to influence a decision by the

17   factfinder, you're saying that that doesn't amount to

18   obstruction?

19        MR. INVICTUS:  I believe that the defendant,

20   defending herself and saying what her state of mind was at the

21   time, is something that is in factual dispute and that the

22   government has the right to cross-examine and Your Honor has

23   the right to find her guilty.

24        THE COURT:  But you seem to be suggesting that if a

25   defendant takes the witness stand and says something in her or

1    his defense, that because they said that in trying to defend

2    themselves, that that means you can't have obstruction of

3    justice?  Which, if that's what you're saying, that doesn't

4    seem to comport with what the drafters of the guidelines

5    intended.

6            MR. INVICTUS:  Well, I make the distinction.  So if

7    you were in the box and you were saying -- Ms. Lichnowski were

8    up there and said, Naw, I wasn't in the building, that would be

9    a manifest falsehood.  She's on camera.  That I would agree,

10   that would obstruction of justice.

11           THE COURT:  You're saying it's not a manifest

12   falsehood if somebody says that they thought there was a fire

13   alarm going off in the building but, nonetheless, they went in

14   the building, that that's not significant?

15           MR. INVICTUS:  Not if this is based on our

16   interpretation of the statute, Your Honor.  And that's the

17   whole point of the defense's case, is that there were no posted

18   signs outside that said this is a restricted area.  There was

19   no cordon of police to say that this is a restricted area.  So

20   under the statute, the defense's position has always been that

21   the Capitol building was not a restricted area as required by

22   the statute.

23           So for her to say, look, I didn't know the alarm

24   meant I couldn't go in there, that's referring to the

25   requirements of the statute.  And so --

1          THE COURT:  I think anyone with reasonable

2     sensibility, seeing broken windows, hearing an alarm blaring,

3     you know, smelling teargas, and contrary to what you may, you

4     know, argue, I think the evidence clearly indicated that

5     individuals, including your client, who entered had to have

6     seen the confrontation that was taking place between the

7     rioters and the police.

8          MR. INVICTUS:  Well, I think, as far as that part is

9     concerned, you know, Ms. Lichnowski had testified that she was

10    in the back of the terrace, looking through a crowd, and could

11    not see any cordon of police.  And that was not only

12    uncontradicted, it was actually corroborated by the testimony

13    of Officer Pias, who said that he couldn't see her when she

14    was, you know, 20 feet in front of him inside the building.

15    That crowd was thick.  She's what?  Five-Five, five-six?  She

16    couldn't see over all these people to what was going on there.

17    And that was actually never contradicted by the government.

18          But the point about the fire alarms is that we might

19    say, as reasonable people, look, there's a fire alarm going

20    off, I don't want to go in there.  But that wouldn't mean that

21    it's a restricted building under the statute, so 1752.  So

22    those are different --

23          THE COURT:  Again, I don't buy that she thought --

24    that's the point I'm making, I don't buy that she thought it

25    was a fire alarm because, like I say, if she thought it was a

1    fire alarm, unless she had a death wish, you don't go into a

2    building where a fire alarm is going off.  So I'm saying she

3    had to have appreciated that that alarm was going off to show

4    that entry into the Capitol was not permissible, that's the

5    point I'm making.

6            MR. INVICTUS:  Your Honor, my memory of the testimony

7    is that the doors at issue here, the doors that were on the

8    camera, were actually the exit doors and that this was an exit

9    alarm, or a fire alarm or something that had been tripped by

10   opening these doors.  And if that's the case, again, that would

11   not go to show that this is a restricted building under the

12   terms of the statute.

13           I understand Your Honor is saying that, you know, if

14   you hear an alarm like that, whether it's a fire alarm or an

15   exit alarm or something, we wouldn't go in there.  But that

16   doesn't mean that she's obstructing justice by saying that I

17   didn't know this was a restricted building.  I think those are

18   two different issues.

19           THE COURT:  Well, if you're charged with having

20   illegally gone into the building, I guess I'm having a hard

21   time understanding how, if an alarm is going off and it's not a

22   fire alarm -- because I don't buy that she thought it was a

23   fire alarm -- but it's an alarm going off, which would

24   indicate, to me, somebody of reasonable sensibility would

25   appreciate that that alarm is going off because you're not

1    supposed to enter that building.  But we just don't have that,

2    as I said; I mean, we've got teargas, we've got, obviously, a

3    mob of people entering the building, we've got broken windows.

4    We've got all these things, and for me to buy the proposition

5    that somebody under those circumstances, who is a college

6    graduate, did not appreciate that she was not welcome to go

7    into that building, to me just doesn't make sense.

8         MR. INVICTUS:  I understand, Your Honor.  There is a

9    difference between not being welcome in the building and the

10   building being restricted under the terms of the statute.  And

11   all of that aside --

12        THE COURT:  So you're saying if you get to this

13   courthouse and you see a mob of people trying to get in here

14   and you hear that alarm going off at that door and you smell

15   teargas, you're saying you would think it would be all right to

16   come into this courthouse?

17        MR. INVICTUS:  I'm not saying that.  I'm saying that

18   aside from that entire argument, if I were sitting in that box

19   and that were my position, I wouldn't be obstructing justice,

20   that's our position, that it shouldn't be a two-point increase

21   in the guidelines calculation because that was her mental state

22   at the time.

23        THE COURT:  As I see it, I think the guideline is

24   designed to give an increase if somebody is providing false

25   information in order to avoid being held culpable for conduct

1    that they committed.  I think that was the intent of the

2    drafters, that if that is in fact the case, that a two-point

3    increase is in fact appropriate because you've sought to try

4    and avoid the consequences of your illegal conduct by providing

5    false information.

6            MR. INVICTUS:  Well, I just -- I would rest on the

7    statement that -- the Court has found her guilty and I think

8    that is the proper remedy for saying I don't believe this state

9    of mind; I think that, you know, this is not the fact that I

10   found as the trier of fact.  But I think that is separate from

11   adding a two-point increase, Your Honor.

12           THE COURT:  Okay.  I understand.  If I'm wrong, the

13   Court of Appeals will tell me.  But I think, as the government

14   argues and as the evidence so indicated, there are a lot of

15   factors, which I've already set forth, which in my view would

16   have indicated to the defendant that the building in fact was

17   restricted, and with the knowledge, based upon all that was

18   occurring at that time, I would have to conclude that she

19   understood that she was not permitted to enter.  And she took

20   the witness stand and said something totally contrary to that,

21   which in my view just is not consistent with the evidence.

22           So I would have to conclude, consistent with the

23   government's position on this point, that two-points for

24   obstruction of justice is in fact appropriate.

25           Okay.  Other matters regarding the guidelines?

1            MR. INVICTUS:  Yes, Your Honor.  We would also argue

2       for a two-point reduction for acceptance of responsibility.

3       And concerning the Court's statements just now, I think what I

4       would like to do is have Ms. Lichnowski read her statement to

5       the Court and then I would argue that, if that's all right with

6       you.

7            THE COURT:  I mean, obviously she can do that, but, I

8       mean, does that negate everything else that occurred?  That

9       would seem to be inconsistent with her accepting responsibility

10      for her conduct.  I don't begrudge somebody, obviously, for

11      going to trial, that's what our system is about.  But if they

12      go to trial and they provide what I've concluded -- again, if

13      I'm wrong, the Court of Appeals will tell me -- but based upon

14      everything as I see it, she in fact provided false information

15      about the situation in order to avoid being found guilty of the

16      conduct she was convicted of.

17           Under those circumstances, I just don't see how I can

18      conclude that she accepted responsibility for her conduct,

19      despite what she may say now, which is important, I think, in

20      my assessment of what penalty is appropriate.  But, I don't

21      think it really bears on whether the guideline should be

22      increased -- or, decreased, I'm sorry.

23           MR. INVICTUS:  Well, to Your Honor's point there, and

24      you had opened with that as well, her statement, does it have

25      any bearing on whether she's accepted responsibility or not?  I

1    think the comment to the guidelines would say Your Honor is

2    correct.  I think, though, that in taking Ms. Lichnowski's

3    statement, in combination with the 22 people who have filed

4    letters for her, saying that -- and, you know, this is not

5    something that we gamed the Court with.  I didn't have any

6    contact with these people.  You know, they, on their own, said

7    in their letters to the Court that she has shown remorse to

8    them.

9         She has said privately to people, you know, that she

10   regrets having gone, that she has shown deep remorse for this

11   in private.  And I think the government's position, with all

12   due respect to the government, that she should make some show

13   of her remorse, that can't be the standard for acceptance of

14   responsibility, otherwise you would have to abandon all dignity

15   to have a two-point reduction for acceptance of responsibility.

16   I think the fact that she's accepting that responsibility

17   today, that she has since her arrest and since all this has

18   happened confessed this privately to the people closest to her

19   and they have, on their own, said this to defense counsel and

20   to the Court in these letters, I think all that in combination

21   would argue for a two-point reduction, Your Honor.

22        THE COURT:  Again, I don't disagree with the

23   proposition that it's relevant in assessing what penalty should

24   be imposed, but as the guidelines relate, I don't agree that,

25   you know, someone can take the witness stand, provide -- which

1    I've concluded -- false information in order to avoid

2    culpability and then argue that because later they take a

3    position acknowledging culpability, that they're entitled to

4    the two-point reduction under the guidelines.  I just don't

5    think it works that way.

6           I think if you don't, you know, either plead guilty

7    or you don't in some way otherwise indicate your culpability

8    until such time as you're actually being sentenced, I don't

9    think that gets you off the hook in reference to getting a

10   reduction based upon accepting responsibility.

11          So I understand your argument, but I will conclude

12   that she's not entitled to a reduction under the guidelines

13   based upon acceptance of responsibility.  But, obviously, in

14   deciding what the appropriate sentence is, I will take into

15   account what her current position is regarding her, you know,

16   accepting responsibility for what occurred.

17          MR. INVICTUS:  Yes, Your Honor, I understand.  So

18   with those additions and reductions, those are all -- that's

19   all that we have to say about the guidelines calculations.

20          THE COURT:  I guess, you know, obviously I'll hear

21   from her, I have to, that's appropriate, but I guess, you know,

22   what I'm struggling with -- and I'll be very candid, because I

23   think it's important for judges to be transparent in reference

24   to what they are thinking before they decide what the

25   appropriate sentence is so counsel can address it.  You know,

1   from one perspective, obviously, you know, we're talking about

2   someone who doesn't have any prior record.  She's had

3   challenges in her life, yes, but, you know, she's got an

4   education.  She's, from everything that's been indicated, seems

5   to have been a good employee and has seemed, you know, by and

6   large, to live a decent, good life.

7           What most concerns me is, number one, you know, even

8   though we disagree on the point, is the fact that she did take

9   the witness stand and in my view did provide false testimony in

10  order to avoid culpability, and I consider that significant.

11  So I think, you know, when somebody takes an oath, there's a

12  significance that comes with that and we expect when somebody

13  takes an oath that they're going to be truthful and, in my

14  view, she was not, and I find that very troubling.

15          I also found very troubling, just regarding the event

16  itself -- you know, my position regarding these cases is I

17  consider them to be very serious, but obviously there's a

18  gradation of what penalty is appropriate based upon the conduct

19  that the individual engaged in.  And my position has generally

20  been, regarding these cases, that if somebody -- as

21  reprehensible as it was -- just went into the Capitol, didn't

22  engage in any violence, didn't destroy any property and just

23  was there, that under those circumstances I've given probation.

24  But, if there are other factors that come into play, I've

25  decided that some greater punishment than probation is

1    appropriate.

2              And here, I guess the concern I have is that, like I

3    say, in my view she did not provide truthful testimony and it

4    was clear, based upon the evidence presented during the trial,

5    that she was chanting something totally, you know, problematic

6    in reference to the police.  And I found that to be very

7    troubling.  And then some of the things that the government

8    introduced, the evidence regarding what was said by her in

9    posts after the event, those things, you know, do cause me a

10   lot of concern because, you know, we're here, we're not just

11   talking about somebody who merely went in and did nothing else

12   but go in and then go out.

13             But, taking that into account, obviously I'll hear

14   from you as to why those factors I've indicated should not be a

15   reason to give something more than probation.

16             MR. INVICTUS:  Yes, Your Honor.  I would just rely,

17   as far as the testimony aspect, on what I've argued so far.  I

18   do believe it was a good faith dispute of fact and that Your

19   Honor has found her guilty and that is the appropriate action

20   to take.

21             As far as the Facebook posts, I mean, these are

22   things taken, you know, after the fact, that don't indicate why

23   she went in there or what was going on through her head at that

24   time.  I think they're taken out of context in the sense that

25   these are part of fairly combative political atmosphere at the

1  time, where everybody who was even present here in D.C. that

2  day to protest the election results was attacked cross the

3  board, from coast to coast.  And I got to understand that they

4  would be defensive about that and that they would say things

5  they wouldn't normally say.  Doesn't indicate her state of mind

6  at the time, but it certainly indicates that she's going to be

7  defensive about it, she's going to say things that, you know,

8  looking back on it years later, look impolitic.

9          But I wouldn't put her feet to the fire based on a

10 Facebook post in a very contentious atmosphere.  I think I

11 would ask the Court to look at her conduct inside of the

12 building, which actually was just walking through, sitting

13 down.  The government contends that she didn't listen to the

14 police as she should have; we would contend otherwise.  But

15 there's no question that she wasn't the one breaking in the

16 doors, she wasn't the one pushing the cops back, she wasn't

17 throwing things or breaking windows, she wasn't pulling fire

18 alarms.  None of that conduct can be attributed to

19 Ms. Lichnowski, even though, collectively, I understand Your

20 Honor's position as to the group itself.

21          So these things, I would say, that she still

22 qualifies --

23          THE COURT:  The reason the posts I find so troubling

24 is, you know, I have real concerns about the future of our

25 country.  You know, fortunately, in reference to this most

1    recent election, we had a President and Vice President who did

2    the right thing, and did what should have happened back in

3    2020, and that is to accept defeat, because somebody is going

4    to win and somebody is going to lose.  And they had, you know,

5    the grace to even call Mr. Trump, despite all the things that

6    he had said about them, and congratulate him and wish him the

7    best.  You know, and that's what should have happened.  That

8    didn't happen in 2020.  And it was people like your client who

9    bought in on the alleged -- I'm sure she wouldn't, if her

10   feelings about Mr. Trump are still the same, I'm sure she

11   doesn't think the most recent election was fraudulent because

12   he won.

13         And, you know, that's very problematic, if we're

14   going to be in a situation where just because American citizens

15   don't get the result that they want, that they say there was

16   fraud, but when they get the result they want, through the same

17   process, it's not fraud.  We're in trouble if that's the --

18   because I hope -- I hope that those who were supportive of

19   Vice President Harris don't have the same attitude that your

20   client had and do what your client did in response to a result

21   that they didn't want that occurred.  That's where I think

22   we're in real trouble as a country, when we're not prepared as

23   citizens to accept the will of the majority.

24         MR. INVICTUS:  Well, Your Honor, I think there's a

25   fine line to walk between disapproving of President Trump and

1    what his supporters did, or didn't do, on the one hand.  And on

2    the other hand, arguing, as the government has, the fact that

3    she came down here to protest a stolen election is somehow

4    worthy of being thrown in jail, which I think is how --

5         THE COURT:  I don't think they're saying that.  I

6    don't think they're saying that.  And I don't agree -- you

7    know, if it wasn't for the fact that American citizens could

8    protest what they don't like without engaging in violence, I

9    wouldn't be where I am.  Because it was protests that gave

10   people like me the opportunity to share in the American dream.

11   So I wouldn't in any way, you know, criticize anybody for

12   protesting, as long as they do it peacefully.

13        MR. INVICTUS:  Well, the Facebook posts we're talking

14   about, correct me if I'm wrong, but we're talking about the

15   voter fraud, you know, the election was stolen.  And these are

16   the screenshots I remember being shown in the government's

17   sentencing memorandum.  Unless we're talking about something

18   completely different, I think that what we're talking about is

19   penalizing the defendant for the reason that she came to D.C.

20   to protest, that I think would be inappropriate.

21        THE COURT:  But she bought in on the proposition that

22   there was fraud.  And there just has been no evidence that

23   there was fraud.  And clearly no evidence there was fraud that

24   was significant enough to undermine the election in 2020.  So

25   she bought in on a lie and then acted on it and that's

1    troubling.

2         MR. INVICTUS:  I would submit to Your Honor that

3    perhaps the blame would be laid on --

4         THE COURT:  The what?

5         MR. INVICTUS:  The blame then would be laid then on

6    the people higher up.  I mean, if Your Honor's position is that

7    Ms. Lichnowski bought into this, I mean, I think the Court

8    would think of her as something of a victim.

9         THE COURT:  She's an educated woman.  You know, we

10   expect people to use their common sense and use their

11   intelligence and not act upon just what somebody tells them.  I

12   mean, there's so much disinformation and misinformation out

13   there now, if we're going to give people a pass because they

14   listened to what somebody says, regardless of what they say

15   because it's what they want to hear, again, we're in trouble.

16        MR. INVICTUS:  Well, I understand Your Honor's

17   position on the election and all of that.  I would just say

18   that in terms of sentencing, what we're talking about is her

19   actions inside the Capitol, her actions of entering the

20   grounds, being in there, what did she do while in there?  And

21   had she been there for an animal rights protest or for, you,

22   now, a July 4th thing, or anti-Israel, whatever her purpose for

23   being there, I think it would be irrelevant to her purpose for

24   being inside of the -- or, her actions inside of the Capitol.

25        I think that's really what the sentencing should come

```
 1    down to, is her actions for being there, what she did inside
 2    the building, how she left.  It shouldn't come down to her
 3    ideological state at the time.
 4              THE COURT:  You're saying our democracy and
 5    maintaining that democracy is not important enough to sanction
 6    people if they do something to try and undermine that
 7    democracy?
 8              MR. INVICTUS:  Well, my point is that if Your Honor's
 9    position is that, well, she's deserving of more punishment
10    because of the ideological grounds than if she had been an
11    animal rights protester or an eco protester, or whatever other
12    protestor could have walked in the building that day, then that
13    would not be right morally.  And that, legally speaking, what
14    we should be looking at in the sentencing is her conduct inside
15    of the building and her actions that day.  And also, as I said
16    earlier, the remorse she's shown to the people closest to her,
17    and the remorse she has shown privately.
18              THE COURT:  Okay.
19              MR. INVICTUS:  Thank you, Your Honor.
20              THE COURT:  You want me to hear from your client?
21              MR. INVICTUS:  Yes, sir.
22              THE COURT:  Okay.
23              MR. INVICTUS:  Thank you.  Would she should come here
24    (indicating)?
25              THE COURT:  Yes.
```

1          THE DEFENDANT:  Good morning, Your Honor.  Many

2    subscribe to the belief that experience is the best teacher.

3    I've spent the last three years thoroughly reflecting upon the

4    experience that got me here today.  I attended the protest on

5    January 6 to be with like-minded, civil people who were

6    well-informed and generally concerned about election integrity.

7    I had no vested interest in disrupting any certification of

8    Electoral votes because it would only benefit the individuals

9    who wanted to conceal malfeasance that I and many others

10   believed occurred.

11         I registered with a legitimate organization that was

12   issued a demonstration permit by the U.S. Capitol Police Board.

13   I diverted from the path to the demonstration area and entered

14   the Capitol building only because I was told that the building

15   was evacuated.

16         On the grounds and in the building, I neither

17   personally caused or witnessed others causing damage to

18   property.  On the grounds and in the building, I neither

19   participated in nor was in the presence of violence, not

20   between demonstrators and not between demonstrators and law

21   enforcement officers.  In the building I positioned myself in a

22   direct line of sight of law enforcement officers so that I

23   could await their direction, which I trusted, respected, and

24   valued as a product of the law enforcement family.  I did not

25   communicate with, confront, or verbally or physically assault

1    any of them.  I also promptly complied with all directions they

2    provided.

3         I did chant the word "traitor" with the crowd in the

4    building I thought was evacuated and empty.  Traitor is a

5    strong word and probably ill advised.  But I believed my speech

6    was protected under the First Amendment.

7         THE COURT:  So you're saying you thought it was all

8    right to call the police officers traitors?

9         THE DEFENDANT:  I was not calling the police officers

10   traitors.

11        THE COURT:  Who else was there who you could be

12   directing that to?

13        THE DEFENDANT:  It was more about Congress, generally

14   speaking, you know, who we felt needed to do their job and look

15   into these issues with the elections that we thought existed.

16        THE COURT:  But why?  I mean --

17        THE DEFENDANT:  I don't call police officers

18   traitors.

19        THE COURT:  Why would the congressmen -- why would

20   they be traitors?  Just because maybe they had a different view

21   from you?

22        THE DEFENDANT:  No, I knew, Your Honor.  I do believe

23   that there were even issues with this election as well.

24        THE COURT:  Were there problems with this election,

25   with the result that we got now?

1          THE DEFENDANT:  I do think there's problems with our

2    elections, generally speaking.

3          THE COURT:  So you're thinking that the election that

4    just elected a president, the incoming president should be

5    overturned because of fraud?  There's no evidence of that.

6          THE DEFENDANT:  I just said that there is election

7    integrity issues.

8          THE COURT:  Seemed like this was a fair election and

9    Mr. Trump won legitimately.

10          THE DEFENDANT:  I think we've had the issues for

11    several -- several years, Your Honor.

12          THE COURT:  Okay.

13          THE DEFENDANT:  I entered the Capitol through an open

14    door, despite noticing it was previously vandalized and that

15    there was a fire alarm sounding inside.  Still, none of these

16    factors led me, an otherwise educated woman, to believe that

17    the building was restricted or that my entry or remaining was

18    criminal.  And police officers standing in the lobby where I

19    entered -- entered, excuse me, did not tell me to leave.

20          It was not until I was in the Crypt of the Capitol

21    that an officer finally pointed me in the direction for me to

22    leave.  The exit was blocked by people and another officer

23    directed me to leave in the opposite direction of the first

24    officer.  And either way, I complied, both times that I was

25    directed.

1           Lastly, I presumed that if my presence in the

2      building was unlawful, police officers would have given some

3      kind of dispersal orders immediately and clearly.  I did not

4      act with malice, anarchy, or violence, nor did my actions lead

5      to the tragic deaths of U.S. Capitol Police officers.  I was a

6      peaceful demonstrator.

7           I know the difference between right and wrong.  I

8      know the difference between lawful and unlawful.  I have

9      attended protests in Washington, D.C. in the past and I am

10     aware enough to recognize mob-like behavior, which I do not

11     associate with.  I revere law and justice and I respect our

12     dedicated law enforcement officers.  This process has been

13     punishment enough.

14          As this is my first offense, I ask for leniency and

15     mercy.  And I say this knowing that there are January 6

16     defendants who should be incarcerated and held accountable for

17     their actions, as they injured police officers, destroyed or

18     vandalized property and actively tried to be disruptive.

19     However, my sentence should be based on the merits or demerits

20     of my own conduct.

21          I respectfully seek the Court's mercy, compassion,

22     and understanding in issuing my sentence.  These are all

23     hallmarks of great leadership, as is discretion.  I lead a

24     law-abiding life.  I am not a criminal.  I ask that I be able

25     to stay with my family that I care for, the businesses I run,

1    the young women I mentor, the community I'm helping rebuild

2    from hurricanes, and the many others who depend on me.

3         I hope that my involvement with January 6th does not

4    obscure the good that I have done and will do, and the life I

5    lead in service to my community and my country.  I am not

6    perfect and I do take responsibility for my lapses in judgment.

7    And I do ask that the Court consider all of my experiences, and

8    not this sole one, in its determination of a just punishment.

9    Thank you.

10        THE COURT:  Anything else from the defense?

11        MR. INVICTUS:  Yes.  Thank you, Your Honor.  So in

12   going back to the guidelines calculations with a base offense

13   level of 10, with the two-point increase of obstruction of

14   justice, but a two-point decrease for being a zero-point

15   offender, Ms. Lichnowski is at a level of 10 for the guidelines

16   calculations.  This puts her in Zone B, which grants Your Honor

17   the authority, the discretion to put Ms. Lichnowski on

18   probation.

19        This being her first offense and she being a

20   law-abiding citizen, I ask Your Honor to take that into

21   consideration, along with the numerous people who had written

22   letters for her.  And not just, you know, neighbors, or people

23   she parties with, but her fiancé, who is present in the

24   courtroom right now; the young ladies that she mentors at

25   jiu-jitsu and in business; her family, you know, her former

1   business partners, all these people are constructive, producing

2   members of society, who have come to bat for Ms. Lichnowski and

3   said that this is aberrant conduct, that she has expressed deep

4   remorse to them.

5            She is a positive force for good in her community,

6   not just at the Jiu-Jitsu Academy, but also her business where

7   she works and the community at large.  Her family, she took

8   care of her little sisters and raised them after the death of

9   their mother.  And this is a person who, by all accounts, bar

10  none, has been an influence for good in everybody around her.

11  And so we would ask that Your Honor exercise the discretion of

12  sentencing Ms. Lichnowski to probation for all of those things.

13  Thank you, Your Honor.

14            THE COURT:  Government, any allocution?

15            MR. STRUEBING:  Yes, Your Honor.  Your Honor, the

16  Court is familiar with the offense conduct in this case so I

17  don't want to retread familiar ground.  What I want to do is

18  address some of the points that were raised in the defendant's

19  sentencing memorandum and in her allocution.  With respect to

20  the offense conduct, the defendant's sentencing memorandum

21  portrays Ms. Lichnowski as a follower, a sort of passive

22  bystander.

23            I'm paraphrasing their memo, but I think they used

24  the word, she lingered on the Upper West Terrace and then,

25  quote, followed the movement of the crowd, unquote.  Upon

1    entering the Capitol, she followed the direction of the police

2    and eventually was able to find an exit.  She just told the

3    Court that she diverted her path from the peaceful protest

4    because she thought the Capitol had been evacuated.

5           Your Honor, at a minimum, I think at a minimum, the

6    defendant is minimizing her conduct on January 6th.  This is a

7    defendant who knew full well what Congress and the

8    Vice President would be doing at the Capitol on January 6th.

9    She, herself, said she wanted to be there for the votes.  She

10   knew all of that and made a choice, a choice to go to the

11   Capitol anyway.

12          At the Capitol, as we've discussed, she ignored

13   numerous warning signs that the building itself was restricted;

14   the blaring alarm, riot, which she admitted to hearing, rioters

15   climbing through broken windows, which she admitted to seeing,

16   her own admission that she smelled teargas, the heightened

17   police presence.  Upon entering the Capitol Senate wing doors,

18   she did not wait for the directions of police.  She elected to

19   join a disruptive mob that was chanting "traitors."  Quite

20   frankly, it doesn't matter whether that chant was directed at

21   the police or members of Congress.  What matters is that she

22   intended to disrupt.

23          She remained unlawfully inside the building for

24   nearly 40 minutes, Your Honor, making herself at home in the

25   middle of the Crypt, taking out a portable chair and taking a

1    seat, occupying the Capitol.

2         I think the passive -- you know, the follower,

3    passive bystander story goes on.  Once inside the building, the

4    defendant's sending -- sentencing memorandum, excuse me, claims

5    that she never heard a clearly intelligible police disbursal

6    order.  A clearly intelligible disbursal order.  That order

7    came from U.S. Capitol Police Officer Tyrone Adonis, who

8    instructed the defendant to leave.  But the defendant failed to

9    comply with an order of a federal law enforcement officer, Your

10   Honor.

11        By refusing to leave, the defendant made it more

12   difficult, just that much more difficult for the police to

13   restore order.  And it directly contributed to the interruption

14   of Congress doing its constitutional duty under the Twelfth

15   Amendment.  Instead of complying, the defendant just picked up

16   her things, moved to the center of the Crypt by another pillar

17   and hung out there for another ten minutes.  That's Government

18   Sentencing Exhibit 2.  And she doesn't leave until 3:32 p.m.,

19   when the Crypt is flooded by police officers.

20        This kind of revisionist history, the passive

21   bystander story, I think, Your Honor, it shows both a lack of

22   remorse and a lack of acceptance.  And then blaming the police

23   for not giving a disbursal order, quite frankly, that does a

24   disservice to what the officers, including Officer Adonis, did

25   on January 6th, 2021.

1          With respect to the obstruction of justice, I think

2     the Court has already noticed it, but the defendant has offered

3     several falsehoods about her interaction with Officer Adonis

4     about trying to find an exit.  You know, her claim that she was

5     allowed to be in the building, despite all of the obvious

6     warning signs.  None of that was true.  All of it was

7     calculated to deceive this Court.

8          The defendant's obstruction is corrosive to the

9     criminal justice system and that explains why the government is

10    asking for the high end of the guidelines range.

11         With respect to the defendant's personal history,

12    government believes that her contributions to her community,

13    her upbringing and subsequent sobriety are commendable and I

14    think that should factor, undoubtedly, into this Court's

15    sentence.  But it also has to be balanced against her

16    obstruction and her lack of remorse.

17         The letters submitted on Ms. Lichnowski's behalf I

18    think are also moving, they should also factor into this

19    Court's sentence.  I obviously have no basis to contest what's

20    in those letters.  I do just want to make one point:  Many of

21    the letters -- I think many of the letters make the point that

22    Ms. Linchnowski is a law-abiding citizen, a patriot, and the

23    letter writers do not think that she would ever intentionally

24    commit a crime.  And defendant may very well be a law-abiding

25    citizen and a patriot, but she wasn't on January 6th, 2021.

1    She was the opposite of those things.

2              As this Court found, she intentionally committed

3    crimes.  She intended to disrupt Congress, knowing full well,

4    knowing exactly what they would be doing at the Capitol on

5    January 6th.

6              Your Honor, based on the serious offense conduct and

7    the obstruction of justice, a sentence of incarceration is

8    warranted.  Thank you.

9              THE COURT:  Any reply?

10             MR. INVICTUS:  Yes.  Thank you, Your Honor.  Just

11   briefly.  With respect to Mr. Struebing and the government,

12   there are several things I believe are mischaracterized about

13   the facts that were elicited in the testimony and the evidence

14   that was presented concerning Ms. Lichnowski's conduct inside

15   of the Capitol.  One thing being the videos the government has

16   submitted, Exhibits 1 and 2, showing that Ms. Lichnowski was

17   sitting on the stool and that she was approached by Officer

18   Adonis, I don't think that's contradicted.

19             Officer Adonis came up and told her to move and she

20   did, but she didn't move in the way the government wanted her

21   to.  But the fact is, the direction she was pointed to go was

22   blocked by protestors.  She couldn't exit through that door.

23   And we played this throughout her testimony, we showed the

24   video; she moved, then she got up and went out the other door

25   because there was no way to go in the way that she was directed

1    by Officer Adonis.  So I think that's a mischaracterization.

2    The fact is, Officer Adonis himself, while watching the video,

3    he admitted that it did appear that Ms. Lichnowski did comply

4    with his orders.  Didn't comply with it in the way that we'd

5    like to, looking back on it now.  But, again, she couldn't move

6    in the direction she was told to go.

7         She ultimately did exit the building, and, again,

8    without assaulting a police officer or engaging in any other

9    misconduct besides sitting on that stool and waiting to get out

10   of the building.  And I'd point out that before that, she was

11   directed by the officers to enter that Crypt.  She didn't enter

12   that Crypt and sit down on her own accord.  She was conducted

13   with the crowd to go into there and then wait for further

14   instructions.  And given those instructions, she couldn't exit

15   through that door, she did exit out the other one.

16        So I understand Your Honor's concerns as previously

17   stated in this hearing, but that, I don't think, is one of the

18   concerns, that she didn't comply with orders, because she is on

19   video attempting to comply with those orders.

20        As for the contributions to society, I agree with the

21   government, they are commendable.  And I would say that her

22   incarceration is going to affect not just her life or her

23   fiancé, but also the young ladies that she mentors.  It's going

24   to create a hole in the community.  She's helping the victims

25   of the hurricane -- which is over now, admittedly.  But there

1    are other things going on in Florida and there are things in

2    these young ladies' lives that they need Ms. Lichnowski to be

3    there.  So we would again ask for a sentence of probation, Your

4    Honor.  Thank you.

5         THE COURT:  Very well.  I need to give the court

6    reporter a break, we've been going awhile, and I need to think

7    about this.  We'll come back at 1:30 and I'll impose my

8    sentence then.

9         (Recess.)

10        THE COURT:  Okay.  You can call it.

11        THE COURTROOM DEPUTY:  Your Honor, we're on the

12   record again for *United States versus Anna Lichnowski*, criminal

13   case No. 23-CR-341.

14        THE COURT:  Okay.  Well, I took a break because I am

15   conflicted as to what the appropriate sentence is, obviously,

16   because she doesn't have any prior record.  And despite how

17   reprehensible I find her conduct to be because of the nature of

18   the violation and the impact of what took place that day has on

19   our democracy, I obviously take very seriously what occurred.

20   Also, I take into account that up to this point she seems to

21   have lived a law-abiding, decent life and has no prior record

22   and obviously that factors in in deciding what the appropriate

23   sentence is.  But as I indicated, the real concern I have not

24   only relates to the nature of what she did, but, also, in my

25   view, the fact that she took the witness stand, took an oath,

1    and did not testify truthfully.

2           And when I walked into the courtroom, I wasn't sure

3    this morning what I would do, because obviously I wanted to

4    hear the parties and hear whatever she wanted to say.  And I

5    was very troubled by what she said in many respects, because it

6    seems, even at this point, with the time lapse and the ability

7    to reassess what she did, I don't see any sense of contrition

8    on her part whatsoever.

9           In fact, from what she said, I have a distinct view

10   that she thinks that what she did was appropriate.  And that

11   gives me every reason to believe that there is always, because

12   of that, the potential that it may repeat itself.  And that,

13   obviously, is very troubling.  I would think that someone

14   would, after time, appreciate that what was done was wrong,

15   should not have occurred, and would be apologetic in reference

16   to it; but I didn't see any of that.

17          And, you know, I'm sure everyone wants to avoid

18   having to be punished for what they did and, you know, express

19   some remorse in that regard, but in reference to what took

20   place and what she did that day, I just saw no contrition

21   whatsoever.  And that weighed very heavily in what I ultimately

22   have concluded is the appropriate thing to do.

23          I obviously take into account the allocution made by

24   the parties and I respect the positions taken.  I do think what

25   the government's requesting -- I understand why they would take

1    the position that they took, considering the nature of the

2    violation we're talking about -- but I do think it does ask for

3    too much and would be too harsh, considering the role that she

4    played, despite the things that she did.

5           And I, therefore, have reached the conclusion that

6    the appropriate sentence to impose in this case on Count 1 is a

7    sentence of 45 days in jail.

8           On Count 2, I would sentence her to a period of three

9    years of probation.  And in reference to Counts 3 and 4, I

10   would sentence her to one year probation in reference to those

11   two offenses.  All of the probationary sentences to run

12   concurrent with each other.

13          I also, in reference to Count 1 and Count 2, would

14   impose a fine of $2500 on each, to run concurrent with each

15   other.  And on Counts 3 and 4 also, $2500 per charge, also to

16   run concurrent with each other.  So she'll have an obligation

17   to pay $2500 in total as a fine.  And as far as restitution is

18   concerned, I would require, since that's the amount the

19   government has been requesting in this case, is $500 of

20   restitution that she will be obligated to pay.

21          She also has an obligation to pay $25 per charge in

22   reference to Counts 1 and 2 and $10 per charge as to Counts 3

23   and 4 as special assessments.

24          I will permit her to self-report once she receives

25   notification from the Bureau of Prisons where she is to serve

1    her 45-day sentence.  And she should understand that once she

2    gets that notice, she does have to appear.  If she doesn't,

3    that's a further crime for which she could be prosecuted.

4        As conditions of her probation, I would require

5    that -- I'm sorry, in reference to Count 1, I would also -- 1

6    and 2, place her on supervised release, but those supervised

7    release terms would run concurrent with her probationary

8    sentence.

9        As conditions of her supervision once she's in the

10    community, I would require that she not be rearrested for any

11    federal, state, or local crime, also that she not use any type

12    of illegal drugs and that she be tested within 15 days of her

13    release to see if she has any drugs in her system, and that she

14    be tested periodically thereafter at the discretion of the

15    probation department when they deem testing to be appropriate.

16        Also, as conditions of her supervision in the

17    community, she will have to pay the restitution and the fines

18    that were imposed.  And I'll require that if she can't pay

19    those amounts immediately, that she pay the special assessment

20    within 30 days of her release, the total amount, and that

21    thereafter, 30 days thereafter that, that she start to pay on

22    the fine, and she make payments towards the fine of at least

23    $100 per month.  I also would require that she not incur any

24    additional financial obligations, unless she gets authorization

25    from the probation office to do so, until all of her financial

1   obligations to the court have been paid.

2   Also, that she not go to the Capitol building and the

3   area surrounding the Capitol building.  And those will be set

4   forth, the locations, in the judgment and commitment order, and

5   that she not do that without the permission of either the Court

6   or the probation department.

7   Also, that she not return to the District of Columbia

8   again unless she has authorization from the Court or the

9   probation officer to do so.

10   Also, I would require that she perform 200 hours of

11   community service, at a rate of at least four hours per week,

12   as a condition of her supervised release and probation.

13   There's a request for a firearm restriction, but since there's

14   no evidence that she had anything to do with firearms in

15   reference to this offense, I will not impose that condition.

16   The restitution should be paid to the Architect of

17   the Capitol, but the money will be paid to the Court and then

18   the Court will direct those funds to the Architect.  And, also,

19   the fine would be paid to the court.

20   Also, I would authorize the release of the report,

21   presentence report to the appropriate entities and individuals

22   in order to carry out the orders of the Court.

23   She does have 14 days from today's date to appeal her

24   conviction and her sentence to the Court of Appeals.  If she

25   cannot afford to pay for a lawyer to represent her on appeal or

1    to pay for the papers to be filed with that court, those

2    expenses will be paid free of charge by the government.

3            Probation, anything else?

4            THE PROBATION OFFICER:  Good afternoon, Your Honor.

5    Just for clarification purposes regarding the sentence, I heard

6    from the Court on Count 1 is the 45 days of imprisonment?

7            THE COURT:  Yes.

8            THE PROBATION OFFICER:  And then three years of

9    supervised release on Counts 1 and 2?

10            THE COURT:  That's correct.

11            THE PROBATION OFFICER:  And then three years of

12    probation --

13            THE COURT:  Actually, I guess it would be on Count 1.

14    On Court 2, since she did not receive a prison sentence, then

15    that would have to be a period of probation of three years.

16            THE PROBATION OFFICER:  Okay.  So three years of

17    probation, actually, on Counts 2, 3, and 4?

18            THE COURT:  Actually, on 3 and 4 -- yes.  And those

19    are to run concurrent with each other.

20            THE PROBATION OFFICER:  And then there's the 200

21    hours of community service at a rate of four hours weekly.  The

22    special assessment being $70.  A fine in the total amount of

23    $2,500.

24            THE COURT:  Yes.

25            THE PROBATION OFFICER:  Restitution, is that at $500?

1           THE COURT:  $500, yes, total.

2           THE PROBATION OFFICER:  And the fine is at a monthly

3    payment of no less than $100 monthly?

4           THE COURT:  Right, to start.  That would be 60 days

5    after she finishes her sentence of -- jail sentence.  And she

6    has to pay the special assessment within 30 days.

7           THE PROBATION OFFICER:  Okay.  And then there was the

8    location restrictions, as well as -- I believe the Court said

9    financial disclosures?

10          THE COURT:  Yes.  She cannot come to the District of

11   Columbia unless she has authorization from probation to do so.

12   And if she comes to the District of Columbia, she can't go to

13   the Capitol building and the grounds surrounding the Capitol

14   building.  And we will put in the judgment and commitment order

15   the streets which are encompassed within the order.

16          THE PROBATION OFFICER:  And the Court also -- was

17   there financial disclosure?  I thought I heard something

18   about --

19          THE COURT:  Yes, I did forget that.  Yes, she will

20   have to provide any financial disclosure information requested

21   by probation up until the time that she's paid all of her

22   obligations to the court, and also that she not create any new

23   financial obligations without authorization from the probation

24   office or the Court until all of her funds have been paid.

25          THE PROBATION OFFICER:  That's it, Your Honor.  Thank

1    you.

2             THE COURT:  Government, anything else?

3             MR. STRUEBING:  Nothing from the government, Your

4    Honor.

5             THE COURT:  Defense, anything else?

6             MR. INVICTUS:  Yes, Your Honor.  As far as the

7    defendant self-reporting.

8             THE COURT:  For what?

9             MR. INVICTUS:  As far as the self-report of the

10   defendant to incarceration.

11            THE COURT:  Yes?

12            MR. INVICTUS:  Would this be the appropriate place,

13   or would probation, to talk about where that would be?  Because

14   the defendant lives in Florida.

15            THE COURT:  Where she would serve her sentence?

16            MR. INVICTUS:  Yes.

17            THE COURT:  I would authorize her to serve it as

18   close to her home as possible.

19            MR. INVICTUS:  Could we put on the record that that

20   would be Miami?

21            THE COURT:  That will be a recommendation, yes.

22            MR. INVICTUS:  Okay.  Thank you, Your Honor.

23            THE COURT:  Thank you.

24                            *   *   *

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4     foregoing constitutes a true and accurate transcript of my

5     stenographic notes and is a full, true and complete transcript

6     of the proceedings to the best of my ability.

7                              Dated this 17th day of December, 2024

8

9

10                         _____

11                         Janice E. Dickman, CRR, CMR, CCR
                           Official Court Reporter
12                         Room 6523
                           333 Constitution Avenue, N.W.
13                         Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25